UNITED STATES, Appellee

v.

Emmett CHANDLER, Jr., Staff Sergeant
U.S. Army, Appellant.

No. 93–0113.
CMR No. 9102472.

U.S. Court of Military Appeals.

Argued Dec. 3, 1993.
Decided March 23, 1994.

For Appellant: *Captain David L. Thomas* (argued); *Colonel Malcolm H. Squires, Jr., Lieutenant Colonel James H. Weise, Major Frank W. Walterhouse* (on brief).

For Appellee: *Captain Louis E. Peraertz* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Major Kenneth T. Grant* (on brief).

*Opinion of the Court*
CRAWFORD, Judge:

## BACKGROUND

Appellant was convicted of disobeying a lawful general order by wrongfully having a loaded firearm in his quarters, assaulting his wife with a dangerous weapon by pointing a loaded firearm at her head, committing adultery, kidnapping his wife, and making a false official statement, in violation of Articles 92,

128, 134, and 107, Uniform Code of Military Justice, 10 USC §§ 892, 928, 934, and 907, respectively. The judge sentenced appellant to a dishonorable discharge, confinement for 6 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority reduced the period of confinement to 18 months but otherwise approved the sentence. The Court of Military Review dismissed the specification of disobeying a lawful general order but otherwise affirmed the remaining findings and sentence in an unpublished opinion dated July 13, 1992. We granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN, OVER TRIAL DEFENSE COUNSEL'S OBJECTION, RUBY QUARLES WAS ALLOWED TO TESTIFY AS TO WHAT APPELLANT'S WIFE, KIMBERLY CHANDLER, SAID CONCERNING THE ASSAULT GIVEN THAT THIS ADMISSION WAS HEARSAY AND CLEARLY DID NOT FALL WITHIN MILITARY RULE OF EVIDENCE 803(3).

## II

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR WHEN HE ALLOWED THE GOVERNMENT TO USE A PRIOR CONSISTENT STATEMENT TO BOLSTER MRS. CHANDLER'S CREDIBILITY IN VIOLATION OF MIL.R.EVID. 801(d)(1)(B).

Appellant pleaded guilty to all of the aforementioned offenses except for aggravated assault on his wife by pointing a loaded firearm at her head. The evidence at trial consisted of appellant's wife's (Mrs. Chandler's) testimony about the assault and the hearsay testimony of Ruby Quarles concerning what appellant's wife told her about the assault. The two narrow questions before us are: (A) whether the testimony of Ruby Quarles was admissible at trial under an exception to the rule against hearsay; and (B) whether this testimony was improperly used to bolster Mrs. Chandler's credibility.

We hold that the military judge did not err by admitting Ruby Quarles' hearsay testimony and by permitting the Government to use this prior consistent hearsay statement to bolster Mrs. Chandler's credibility.

## ISSUE I

### FACTS

Appellant was caught by his wife, at their home, in the bedroom with his paramour. After some arguing, appellant's wife went into the bedroom to call the military police. Appellant entered the bedroom and pulled the telephone cord from the receiver. When appellant's wife attempted to leave the bedroom, appellant blocked her way, wrestled her to the floor by her hair, dragged her to the closet, got a pair of handcuffs, dragged her back across the floor to the bed, sat on her stomach, kept her handcuffed and tied her arms to the bed with pantyhose, and then wrapped her legs with an electrical extension cord and tied them to the foot of the bed. When his wife screamed, he stuck a pair of pantyhose in her mouth; after she spit them out, he put the pantyhose back in and taped her mouth shut with duct tape. With his wife safely taped and trussed to the bed, appellant showered, dressed, and told his paramour he would drive her home. Before leaving he adjusted the tape and handcuffs and told his wife he would be back in 30 minutes and "hoped they could talk like civilized people."

Mrs. Chandler testified about the handgun as follows:

Q. ... When was the first time on this date [Aug. 17, 1991] and place that you first saw the accused's handgun?

A. He was beating my watch with it.

Q. Now, where were you?

A. I was either on the bed or the floor.

Q. And what position were you in?

A. I was laying on my back.

Q. Where was the accused?

A. He was sitting on me straddle.

Q. What happened at that time?

A. After he beat the watch?

Q. No. Explain to me what happened?

A. Well, I was handcuffed and he was sitting on me and he was trying to get the watch from me and I just opened my hand and gave it to him, and he took it and he beat it.

Q. Who handcuffed you?

A. He did.

Q. And did he take the watch from you?

A. Yeah, pretty much.

Q. And what did he do with it?

A. He took the butt of the gun and beat it, broke it.

Q. What happened next?

A. He moved me to the bed. He just— He pointed the gun at me, he was poking me in the head with it.

Q. Did you see where this gun came from?

A. No.

Q. And did you recognize this weapon?

A. Yes.

Q. And was it the accused's?

A. Yes.

Q. And how did you know?

A. It looked just like his.

Q. Once you were on the bed, where was the accused?

A. On me.

Q. Were you still handcuffed?

A. Yes.

Q. At this time, what happened?

A. He poked me in the head with the gun and he tried to pull back the top and something went wrong and the magazine part was coming out, and he tried to put it back in and something came off of if.

Q. Okay, backing up a little bit. Did he physically touch you with the 9 millimeter handgun?

A. Yes.

Q. Once or several times?

A. A few times.

Q. Did he make any statements to you?

A. Yes.

Q. What did he say?

A. He told me that I really fucked up this time and did I know I really fucked up.

Q. Did he tell you this once or numerous times?

A. Quite a few times.

Q. And then what happened?

A. Then the gun messed up.

Q. When you say "the gun messed up," tell me exactly what happened?

A. Something went wrong, I really don't know. He tried to pull the top back on it and the magazine part started coming out and he tried to put it back in and something flew off and it flew across my face.

Q. Did the entire magazine fall out of the weapon?

A. No, I don't think so.

Q. Did he try to put the magazine back in the weapon?

A. Yes.

Q. And how did he attempt to do that?

A. Just push it in, just like that.

Q. And at that time what happened?

A. Then something came off of the gun.

Q. And this object, did it hit you?

A. Yes, it just grazed my face, my head.

Q. Did you see what this object was?

A. No.

Q. Did the actions that he just took with the weapons, did that happen before or after he pointed the weapon at you?

A. After.

Q. Did it happen before or after he made these statements to you?

A. After.

Q. At any time did you ever see any rounds, any bullets, fall out of the weapon or the magazine?

A. No.

Q. Mrs. Chandler, when this was going on, how did you feel? More specifically, were you frightened that the accused could or would physically harm you?

A. Yes.

At trial Mrs. Quarles testified that Mrs. Chandler "was upset" when she called and asked her "to come up to her house and get her." Mrs. Quarles testified that it took her about 2 minutes to get to Mrs. Chandler's home, and when she arrived Mrs. Chandler was crying and "really upset and she was

real panicky, and she had stuff all around her neck and she was in handcuffs." Mrs. Quarles further testified that the two of them went back to Mrs. Quarles' house and that it took "maybe 30 minutes" for Mrs. Chandler to tell her what happened "because she was real upset and crying and she was in a panic" and "was worried that her husband was going to come back through the door and get her."

When trial counsel asked Mrs. Quarles what Mrs. Chandler told her, trial defense counsel made a hearsay objection. The following colloquy then ensued:

TC: Your Honor, I believe it falls under [sic] state of mind exception.

MJ: Well, focus in on what period of time you're talking about.

TC: When she began telling you what happened, after this 30 minutes of getting her to calm down, you stated she began telling you why she was upset?

A: Right.

Q. From that point, what——

DC: I renew my objection, Your Honor. This is not state of mind. The Government has already elicited testimony from this witness of the physical exhibiting of fear, et cetera, from Mrs. Chandler. This does not qualify. What they're trying to do [sic] elicit hearsay from Mrs. Quarles in lieu of getting the testimony directly from Mrs. Chandler.

TC: Based on her state of mind as described by the ——

MJ: But you asked her in the question, "After she had calmed down, what did she say?" I mean, that hardly qualifies if she had calmed down.

TC: I understand your point, Your Honor, and withdraw the question.

Q: While she was in the state of emotional upset during those 30 minutes it took you, did she say anything to you at that point?

DC: I renew my objection, Your Honor, same basis hearsay.

MJ: That's overruled. Go ahead.

TC: What did she tell you?

A: She was telling me that——

MJ: Now we're talking about the period before she calmed down, only when she was excited.

Mrs. Quarles testified, in pertinent part: She was saying that he had dragged her through the house by her head and took her to the bedroom, he tied her up, and she was saying that he had held a gun on her and he was—he tied her up to the bed, and he had done this because she had came home and caught him with another woman in the house....

\* \* \*

At one point, she was talking about the gun and she said—I think she told me that she thought that she was dead because she heard something move from the gun or she heard a click or something like that....

Military Police Investigator Corey Pratt testified that investigators obtained permission to search the Chandler house and found a 9 millimeter round on the right hand side of the bed; a handgun with "a magazine locked in the well with four rounds ... and a chambered round"; and loose rounds in the closet.

## DISCUSSION

### Hearsay Exceptions

■ Since appellant pleaded guilty to all the charged offenses except assaulting his wife by pointing a loaded firearm at her head, the narrow issue before us is whether the military judge abused his discretion in overruling appellant's hearsay objection.

Appellant argues that the military judge abused his discretion by admitting Mrs. Quarles' hearsay testimony concerning appellant's having pointed a loaded firearm at his wife's head, under the state-of-mind exception to the rule against hearsay. Appellant argues that her testimony should have been limited to Mrs. Chandler's "then existing state of mind, emotion, sensation or physical condition." Mil.R.Evid. 803(3), Manual for Courts–Martial, United States, 1984. The Government, on the other hand, argues that the challenged testimony was admissible on alternative grounds under either the present-sense impression, Mil.R.Evid. 803(1), or the

excited-utterance, Mil.R.Evid. 803(2), exception.

The predicate fact on which appellant bases his argument is that the military judge erroneously admitted the challenged testimony under the state-of-mind exception. We disagree. Although trial counsel mentioned the state-of-mind exception, the military judge never announced the basis for his ruling on the hearsay objection. Further, the military judge was clearly concerned about whether the testimony at issue occurred while Mrs. Chandler was still emotionally upset. A nexus to the event in terms of immediacy or stress of excitement is not one of the foundational elements of the state-of-mind exception, but it is a foundational element of both the present-sense and excited-utterance exceptions to the rule against hearsay.[1]

■ We hold that the challenged testimony was admissible under the excited-utterance exception.[2] The guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event. E. Imwinkelried, P. Giannelli, F. Gilligan, F. Lederer, *Courtroom Criminal Evidence* § 1204 at 309 (2d ed. 1993). This distinction accounts for the latitude given in proving contemporaneity in excited-utterance cases but not in proving that the declarant was under distress of a startling event. *Compare United States v. Jones,* 30 MJ 127 (CMA 1990) (statement inadmissible under Mil.R.Evid. 803(2) because not a reaction to a startling event or made under distress of a startling event), *with United States v. Arnold,* 25 MJ 129

(CMA 1987) (statement made by a 13–year old 12 hours after the accused took indecent liberties with her and while the girl's appearance and emotions were abnormal admissible), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988).

In this case, Mrs. Chandler's statements were made to Mrs. Quarles within 30 minutes after Mrs. Chandler had been trussed to the bed, gagged, threatened with a loaded firearm, and then abandoned after having caught appellant in the bedroom with another woman. Mrs. Quarles testified that it took "maybe 30 minutes" for Mrs. Chandler to tell her what happened "because she was real upset and crying and she was in a panic" and "was worried that her husband was going to come back through the door and get her." Under these facts, we hold that the military judge did not abuse his discretion by admitting the challenged testimony.

## ISSUE II

■ Appellant argues that the Government's use of Mrs. Chandler's statements to Ms. Quarles during closing argument violated Mil.R.Evid. 801(d)(1)(B) by improperly bolstering Mrs. Chandler's testimony. During its closing argument, the Government argued:

First of all, her version of what took place that day has remained consistent. It has stayed the same with what she told Mrs. Quarles and it's the same thing that she told you today. The defense has been unable to show any variance between her statements the first day on August 17th and the statements today.

existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

1. *Rule 803, Hearsay exceptions;* **availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 (1) *Present sense impression.* A statement describing or explaining an event or condition made while declarant was perceiving the event or condition or immediately thereafter.

 (2) *Excited utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

 (3) *Then existing mental, emotional, or physical condition.* A statement of the declarant's then

2. Since we hold that the challenged testimony was admissible under Mil.R.Evid. 803(2), Manual for Courts–Martial, United States, 1984, it is not necessary to determine whether the evidence would be admissible under Mil.R.Evid. 803(1).

 It is very true that consistent statements can only be used after the adversary shows motive to fabricate by an event that occurs between the offense and the trial. *See United States v. Toro,* 37 MJ 313 (CMA 1993).. However, when evidence is otherwise admissible, *i.e.,* under a hearsay exception, then the requirements for a prior consistent statement need not be met. As the Supreme Court said in *United States v. Abel,* 469 U.S. 45, 56, 105 S.Ct. 465, 471, 83 L.Ed.2d 450 (1984), "[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case."

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, GIERKE, and WISS concur.

SULLIVAN, Chief Judge (concurring in part and in the result):

I generally agree with the majority opinion. In this regard, however, I would note the discussion by the Supreme Court of the spontaneous-declaration exception to the hearsay rule in *White v. Illinois,* —— U.S. ——, —— n. 8, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992).