UNITED STATES, Appellee,

v.

Stanton L. HANER, Technical Sergeant,
U.S. Air Force, Appellant.

No. 97–0157.
Crim.App. No. 31786.

U.S. Court of Appeals for
the Armed Forces.

Argued March 3, 1998.

Decided Sept. 22, 1998.

For Appellant: *Major Kevin P. Koehler* (argued); *Colonel Douglas H. Kohrt* (on brief); *Colonel David W. Madsen.*

For Appellee: *Captain Steven D. Dubriske* (argued); *Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin,* and *Major Allen G. Erickson* (on brief).

---

*Opinion of the Court*

COX, Chief Judge:

Contrary to his pleas, appellant was convicted [1] by a general court-martial of 2 specifications of assault consummated by battery and committing an indecent act with his wife, in violation of Articles 128 and 134, Uniform Code of Military Justice, 10 USC §§ 928 and 934, respectively. A panel of officers sentenced him to a bad-conduct discharge, confinement for 302 days, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the Court of Criminal Appeals affirmed in an unpublished decision dated September 9, 1996.

This Court granted review on the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY ADMITTING PATTY HANER'S STATEMENTS TO OFFICER FANELLI AND SERGEANT DEMATTEO AS EXCITED UTTERANCES UNDER MIL.R.EVID. 803(2).

II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY ADMITTING PATTY HANER'S STATEMENTS TO DR. BYERS AND LT. COL. TYLER AS STATEMENTS MADE FOR THE PURPOSE OF MEDICAL DIAGNOSIS OR TREATMENT UNDER MIL. R.EVID. 803(4).

III

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY ADMITTING PATTY HANER'S WRITTEN STATEMENT TO THE OSI UNDER THE RESIDUAL HEARSAY EXCEPTION, MIL.R.EVID. 803(24).

Finding that the military judge did not abuse his discretion by admitting the hearsay evidence, we affirm the decision of the court below.

*Factual Background*

Appellant married Patty Haner in April 1993, shortly after his first marriage ended in a divorce. This was the second marriage for both individuals. Appellant's first marriage had lasted 20 years, and his 3 children from that union lived with their mother. Mrs. Haner had custody of twins from her first marriage. The marriage was on a shaky foundation from the very beginning, mainly because appellant had a drinking problem,[2] and his children deeply resented Patty.

Shortly after their marriage, the Haners moved to Griffiss Air Force Base (AFB),

---

1. The court below erroneously stated that appellant was convicted of 2 specifications of aggravated assault. Unpub. op. at 1. We are satisfied that this error had no effect on that court's action on the sentence.

2. Appellant had self-identified for alcohol problems back in the fall of 1992, and he was treated at the Sheppard Air Force Base Alcohol Rehabilitation Center.

New York, pursuant to a humanitarian reassignment, which enabled appellant to care for his dying mother during her last days. The death of his mother precipitated appellant's return to drinking. His drinking resulted in frequent arguments with Patty. Appellant was diagnosed at the mental health clinic at Griffiss AFB as suffering from major depression and alcohol dependency. He was prescribed antidepressant medications and enrolled in a Social Action After–Care Program. By December 1993, he again appeared to be on the road to a solid recovery. However, sometime in March in 1994, appellant experienced a relapse.

The offenses which led to appellant's court-martial occurred on April 7, 1994. On that day, Patty Haner fled from her home with only a blanket wrapped around her and called the civilian police from a neighbor's trailer. When Officer Salvatore Fanelli and Sergeant Gary DeMatteo, police officers from Rome, New York, arrived, they found Mrs. Haner in a distraught condition. She was crying and appeared very upset. Mrs. Haner told the officers that her husband had tied her up and threatened to kill her with a knife. Based on Mrs. Haner's accusations, the police officers arrested appellant.

The next day, Mrs. Haner was treated by Dr. Gerald T. Byers, a family practitioner at the hospital on Griffiss AFB. The doctor observed multiple belt marks on her body and a knife scrape which ran the full length of her chest. Her wrists and ankles exhibited tape marks, which the doctor described as consistent with prolonged restraint and torture. Following the examination by Dr. Byers, Mrs. Haner went to the mental health clinic, where she was seen by Lieutenant Colonel (LtCol) Leonard M. Tyler, a clinical social worker. Mrs. Haner gave accounts of what had happened to her to both Dr. Byers and LtCol Tyler.

While her husband was in jail, Mrs. Haner took her children to Michigan. When appellant was released on April 14, he made several telephone calls to his wife. He was angry that she had taken everything out of the trailer, and he wanted his things back.

The day after receiving telephone calls in Michigan from her husband, Mrs. Haner contacted the Air Force Office of Special Investigations (OSI), and agents responded to the call by coming to her home. During the visit, she provided them with a sworn, written statement. In her statement, she said appellant had called her a "fucking bitch" over the phone and told her, "I dare you to come back to New York and see what happens." She also claimed that, in his final phone call, appellant told her, "I'm coming to get you baby girl."

In her written account, Mrs. Haner stated her husband had come home from work on April 6, 1994, and started drinking. She indicated that an argument ensued, which she attempted to terminate by going to bed. She said that her husband refused to allow her to sleep and repeatedly woke her up throughout the night to argue with her.

Mrs. Haner said that the next morning, after she took her two children to school, she returned to her trailer and discovered that appellant had not gone to work. He was still drinking and told her he was losing his mind and was planning to rape and kill her. Thinking that his comments were solely the result of his excessive drinking, she did not believe he would actually harm her. She said she called her office to let them know she was not coming to work, and then she went to bed.

Her statement reveals that, shortly thereafter, appellant entered her bedroom with his hunting knife in one hand and duct tape in the other. Holding the knife against her, he made her get undressed. She said that, when she took off her shirt, appellant reached out with his knife and cut her bra off.' At some point, she recalled appellant saying, "I'd rather kill you than look at you."

Her written account details how appellant proceeded to torture her over the next 3 hours. She said he made her lie stomach-down on the floor while he taped her wrists and then her ankles together. He then began beating her with a leather belt. She described how appellant scratched her back and stomach with the point of his knife. She said that, while her hands were taped, appel-

lant placed his fingers in her vagina, then took them out and placed the handle of the knife in her vagina. She claimed she pleaded for him to stop hurting her and started praying out loud to be saved. Appellant told her he was going to keep her there all day and then kill her.

She revealed in her statement that, for a few moments during the ordeal, her husband changed his demeanor and tried to comfort her. She said he told her he was sorry, and he attempted to make love to her as she continued to cry. She said he eventually cut the tape from her wrists and ankles and let her go to the bathroom. However, he refused to let her close the door, indicating that he did not trust her. She recalled running toward the door, but appellant caught her and threw her into a chair, threatening to cut her hair off. According to Mrs. Haner's statement, appellant left the room for a moment, and she threw his knife under the bed. When he asked where the knife was, she told him she had thrown it out the window. After he began to beat her again, she told him she had thrown it under the bed. She said that, while he looked for the knife, she grabbed a blanket and managed to escape. She ran to a neighbor's house and called the police.

After Mrs. Haner was informed that military charges would be brought against her husband, she recanted her earlier statements. She wrote a letter to authorities at Griffiss AFB, which stated that all of the things appellant did on April 7, 1994, had been consensual.[3] She insisted the activity had been part of the sadomasochistic sexual activity which she and her husband had periodically enjoyed.[4] At trial, Mrs. Haner testified for the defense under a grant of testimonial immunity and reiterated her contention that the beatings and sexual activity had been consensual. Testifying in his own be-

half, appellant also claimed that his wife had consented to his acts on April 7, 1994.

Faced with Mrs. Haner's recantations and the fact that she was the only witness to the charged assaults, the Government had no tactical recourse other than to offer her prior statements about the assaults as exceptions to the hearsay rule. Mil.R.Evid. 803, Manual for Courts–Martial, United States (1995 ed.). Specifically, trial counsel called both police officers, Dr. Byers, and LtCol Tyler to testify about what they had been told by Mrs. Haner about the attack upon her. Finally, trial counsel offered into evidence the written statement which Mrs. Haner executed for the OSI on April 15, 1994. These hearsay statements, all of which were objected to by appellant's defense counsel and subsequently admitted by the military judge, gave the members the Government's rendition of the criminal activity which transpired at the Haner residence on April 7, 1994. They are the focus of the three granted issues.

### Issue I

### Excited Utterances

■ Appellant contends the military judge abused his discretion by admitting the statements made by Mrs. Haner to Officer Fanelli[5] and Sergeant DeMatteo on the morning of April 7, 1994. He argues that the statements do not qualify as excited utterances for purposes of Mil.R.Evid. 803(2).

When the two police officers responded to the call made by Mrs. Haner, they initially went to the trailer in which the Haners lived. They encountered appellant, who met them at his front door. He told the officers that he and his wife had had a fight and that she stormed out. Some 20 minutes later, the officers located Mrs. Haner, who was with a

---

3. Mrs. Haner's letter, dated May 10, 1994, stated in part:
 I consented to all the sexual acts that occurred on 7 Apr 94 between my husband Stanton and myself including taping my hands and ankles, hitting me with the belt, anal intercourse, and vaginal penetration with his hands and the knife. We have always had an active sexual relationship and have done these things many times in the past. He did not do anything

unusual or unnatural to me against my consent.

4. At trial, Mrs. Haner testified that she and her husband engaged in sadomasochistic sex every couple of months.

5. Although Officer Fanelli testified on the motion to suppress the statements made by Mrs. Haner, he did not testify during the case-in-chief.

neighbor who lived several trailers down from the one in which appellant and Mrs. Haner lived. At the time the police officers interviewed Mrs. Haner, she still had the blanket wrapped around her and appeared to be very upset. She was shaking and crying hysterically. She told the officers that her husband had beaten her and threatened her with a knife.

Mil.R.Evid. 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The military judge found that the statements to the police officers were made by Mrs. Haner shortly after a startling and stressful event, and at a time when she was still distraught from the circumstances. He concluded her statements met the legal parameters for excited utterances and were admissible under that exception to the hearsay rule.

The circumstances of the excited utterances in this case are similar to those this Court faced in *United States v. Morgan*, 40 MJ 405 (1994). In that case, a 13–year–old stepdaughter ran to a neighbor's house after she had been raped by her stepfather. We concluded that the statement she made to the neighbor soon after the alleged rape, while she was crying and acting in a hysterical manner, was a textbook example of an excited utterance.

Similarly, in *United States v. Chandler*, 39 MJ 119 (1994), we upheld the admissibility of out-of-court statements by the accused's wife made some 30 minutes after she called her neighbor to come over, following a brutal assault at the hands of her husband. In that case, we concluded that "[t]he guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *Id.* at 123.

Under the circumstances of this case, we are satisfied that the military judge did not abuse his discretion in admitting the statements made by Mrs. Haner to Officer Fanelli and Sergeant DeMatteo as excited utterances. Because they were made less than an hour after her torturous ordeal and while she was still in a state of obvious distress, these statements clearly fall within the purview of Mil.R.Evid. 803(2) and were admissible.

## Issue II

### Medical Exception

■ The military judge ruled that the statements made by Mrs. Haner to Dr. Byers and LtCol Tyler on April 8, 1994, were admissible under Mil.R.Evid. 803(4) as medical exceptions to the hearsay rule. We find no reason to second-guess the military judge's ruling. Mil.R.Evid. 803(4) creates a medical exception to the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

Appellant contends that Mrs. Haner did not voluntarily seek medical attention from Dr. Byers. He claims she went to the hospital at the urging of the District Attorney, who wanted her injuries documented for possible prosecution by civilian authorities. After hearing testimony on the motion, the military judge concluded that the statements by Mrs. Haner to both Dr. Byers and LtCol Tyler were given with the expectation of receiving medical care.

■ The fact that Mrs. Haner was referred to the hospital is not a critical factor in deciding whether the medical exception applies to the statements she gave to those treating her. The critical question is whether she had some expectation of treatment when she talked to the caregivers. The thing we must consider in determining if the medical exception is met is " 'the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed.' " *Morgan*, 40 MJ at 408, citing *United States v. Clark*, 35 MJ 98, 105 (CMA 1992), quoting *United States v. White*, 25 MJ 50, 51 (CMA 1987).

Dr. Byers testified that he conducted an examination of Mrs. Haner to both document the injuries and find out what kind of injuries she had sustained that might require further treatment. Her statements to him were a necessary part of the examination, which revealed painful bruises but no evidence of fractures. As a result of the examination, over-the-counter medication was given to her because of her complaints of pain.

Following the examination by Dr. Byers, Mrs. Haner voluntarily went to the mental health clinic. She was seen by LtCol Tyler, a psychiatric social worker who was serving an inactive-duty-training tour at the clinic as an Individual Mobilization Augmentee. He stated that his first priority was to put her at ease. When he asked Mrs. Haner how he could help her, she related to him the events of the previous day. She explained that she feared for her life and would be leaving the state and going to Michigan. LtCol Tyler stated that he had a legal requirement to document her accounts, but he was also attempting "to help her out as a human being." Concluding that she was suffering from marital problems and from posttraumatic stress, he urged her to seek civilian counseling and continue attending Al–Anon when she got to Michigan.[6] Mrs. Haner followed this advice.

■ With respect to the statements given to LtCol Tyler, we note that the applicability of Mil.R.Evid. 803(4) is not limited to statements made to medically licensed doctors, but may include others, such as persons providing medical treatment under the supervision or direction of medical personnel. As we have previously noted, "[g]iven the proper circumstances, statements made to psychologists, social workers, and other health care professionals may well fall within the purview of the medical-treatment exception to the hearsay rule." *Morgan*, 40 MJ at 408, citing *United States v. Welch*, 25 MJ 23, 25 (CMA 1987).

Our review of the record of trial convinces us that the evidence fully supports the conclusion that the statements made by Mrs.

Haner at the hospital on April 8, 1994, were for the purpose of medical diagnosis and treatment, and that she believed, by being truthful, she would promote her own well-being. Accordingly, we find no abuse of discretion by the military judge when he found that the statements to Dr. Byers and LtCol Tyler were admissible under Mil. R.Evid. 803(4).

## *Issue III*

### *Residual Hearsay*

■ The most complete account which Mrs. Haner gave of the ordeal she experienced on April 7, 1994, was contained in the sworn statement she gave to the OSI a week later. It was in that statement that Mrs. Haner revealed for the first time she had been vaginally penetrated by the handle of appellant's knife. Over defense objection, the military judge admitted the statement under the residual hearsay exception. Mil. R.Evid. 803(24).

Mil.R.Evid. 803(24) provides for the following exception, regardless of whether the declarant is available to testify:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

■ In short, the three requirements which this rule establishes for admissibility are: (1) materiality; (2) necessity; and (3) reliability. *United States v. Kelley*, 45 MJ 275, 280 (1996). In admitting the statement into evidence, the military judge found that each of these requirements was met. In

---

**6.** Al–Anon is a worldwide organization that offers a self-help recovery program for families and friends of alcoholics, whether or not the alcohol-

ic seeks help or even recognizes the existence of a drinking problem.

further support of his findings, the military judge stated:

The Court gives special importance to the following factors surrounding the taking of the statement. Mrs. Haner contacted the OSI at the earliest time she could—the next morning—after receiving the evening telephone threats. Mrs. Haner made the statement in the security of her home on her own computer. There was no pressure from the OSI to prepare the statement. The OSI even left her home to allow her to prepare her statement in solitude. No OSI agent was with her to coach her, to stand over her shoulder, or to suggest wording. This statement was entirely hers. The events were recent, traumatic, and still fresh in Mrs. Haner's memory. She was still in fear that her husband might travel to Michigan to carry out his threats. Mrs. Haner took an oral and written oath—and signed and initialed each page—which enforced the serious nature of the statement.

 In cases such as this, the ruling of the military judge on admitting residual hearsay is entitled to considerable deference. *United States v. Pollard*, 38 MJ 41, 49 (CMA 1993); *United States v. Powell*, 22 MJ 141, 145 (CMA 1986). There can be little dispute about the materiality of Mrs. Haner's statement, and there is no question that it was necessary to the Government's case. *See*

*United States v. Giambra*, 33 MJ 331 (CMA 1991). The question of whether Mrs. Haner's statement passed the litmus test for trustworthiness or reliability is the determinative factor for its admissibility. The Supreme Court has held that the "particularized guarantees of trustworthiness" required by the residual hearsay rule must be shown from the totality of the circumstances. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This Court has also held that, where the concerns of the Confrontation Clause have been satisfied, "corroboration by other evidence is one of the means by which hearsay evidence can be tested for trustworthiness." *United States v. McGrath*, 39 MJ 158, 166 (CMA 1994); *United States v. Hines*, 23 MJ 125, 138 (CMA 1986). Like the military judge, we are satisfied in this case that the circumstances surrounding Mrs. Haner's statement to the OSI are sufficient to establish its reliability. We hold that the military judge did not abuse his discretion in admitting her statement as residual hearsay.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judges CRAWFORD, GIERKE, and EFFRON concur.

Judge SULLIVAN did not participate.