# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38867**

————————————

**UNITED STATES**
*Appellee*

v.

**Thomas E. PARKS, Jr.**
Senior Airman, U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary
Decided 15 February 2017

————————————

*Military Judge:* Mark W. Milam.

*Approved sentence:* Dishonorable discharge, confinement for 6 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 30 January 2015 by GCM convened at Joint Base San Antonio–Lackland, Texas.

*For Appellant:* Major Jeffrey A. Davis, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before DUBRISKE, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge HARDING delivered the opinion of the Court, in which Senior Judge DUBRISKE and Judge C. BROWN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HARDING, Judge:

Officer members sitting as a general court-martial convicted Appellant, contrary to his plea, of a single Charge and Specification of rape in violation of Article 120, UCMJ, 10 U.S.C. § 920. The adjudged and approved sentence was a dishonorable discharge, confinement for six months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

Appellant asserts four assignments of error: (1) Whether the evidence was legally and factually sufficient to prove beyond a reasonable doubt that Appellant raped Senior Airman (SrA) JS; (2) Whether the military judge abused his discretion when he admitted SrA JS's hearsay statements to a sexual assault nurse examiner (SANE); (3) Whether trial counsel made improper arguments during findings; and (4) Whether the Government's violation of the 120-day post-trial processing standard for convening authority's action warrants meaningful relief pursuant to *United States v. Tardif,* 57 M.J. 219 (C.A.A.F. 2002). We find no prejudicial error and affirm.

## I. BACKGROUND

The victim in this case, SrA JS, and Appellant worked together in a mail center at Joint Base San Antonio-Lackland, Texas. Over time, they developed a friendship as part of a group of co-workers who socialized outside the workplace. The relationship evolved into what SrA JS described as "friends with benefits"—meaning, she explained, that she and Appellant would maintain an ongoing sexual relationship without any commitment. They agreed not to tell anybody else about their sexual relationship but that each would tell the other if they began dating someone else.

The relationship between Appellant and the victim continued in this manner until SrA JS, while deployed, discovered that Appellant had been engaged in an on-and-off dating relationship with another Airman, Airman (Amn) CG. Contrary to an agreed-upon term of their "friends with benefits" arrangement, Appellant had not informed SrA JS about his dating relationship with this other Airman. Further, SrA JS knew this other Airman and had considered her a friend.

Despite this, the "friends with benefits" relationship resumed within a month of SrA JS's return from deployment. While SrA JS had hoped that her relationship with Appellant would evolve to a committed boyfriend-girlfriend relationship, it never did.

Late in the evening on 1 December 2013, while SrA JS's roommate, Amn BG, was out of town on leave, Appellant visited SrA JS at her off-base apartment. While lying in bed together, SrA JS told Appellant about a recent medical test result and the anxiety she felt about it. SrA JS testified Appellant told her to be quiet and that he just wanted to have sex. She further testified that even though she did not want to have sex with him, she and Appellant did have sex.

Two days later, Appellant called SrA JS and asked to come over to her apartment again and talk. SrA JS agreed, but expressly told him that they were not going to have sex. Appellant called SrA JS two more times while en route to the apartment to ask what exit to take. On each occasion, SrA JS told

him what exit to take and reiterated that they were not going to have sex that night. Once Appellant arrived, he told her about a death in his family and a planned trip for the funeral. Appellant also brought up SrA JS's medical test, telling her he had talked to a friend who worked in the medical career field about it.

After talking on the couch in the living room, SrA JS went to her bedroom and lay down on her bed. Appellant followed her and also lay down on the bed. Appellant then grabbed her arm to pull her closer, put his arm around her waist, and then began to pull her sweat pants off. As Appellant was grabbing her sweat pants, she attempted to fight him off by pushing his hands away and told him no. She then accidently hit Appellant in the face. Despite her resistance, Appellant was able to remove her sweat pants and underwear. SrA JS testified that Appellant then got on top of her, used his leg to separate her legs apart, and pinned her down by placing his hands on the biceps of her arms. She further testified that she was squeezing her legs together "because [she] didn't want to have sex" but that Appellant was successful in pushing her legs apart. Once her legs were apart, Appellant penetrated her vagina with his penis. SrA JS testified that once Appellant had penetrated her, she shouted at him, scratched him, and bit him in order to get him off of her. SrA JS eventually crawled off the bed, grabbed her baseball bat, and told Appellant that if he touched her again she would hit him with it. Appellant then moved away from SrA JS.

Even after SrA JS wielded the bat, Appellant repeatedly attempted to initiate sexual contact with her. In response to his continued advances, SrA JS went to her bathroom and later brandished a pocket knife. SrA JS next dialed her sister's phone number but no one answered. Appellant again attempted to remove SrA JS's pants and underwear and this time she responded by dialing 911 on her phone and showing Appellant without actually placing a call. At some point, SrA JS went to the room of her roommate, Amn BG, and locked the door to keep the Appellant out. Appellant responded by knocking loudly on the door and eventually convinced SrA JS to come out to talk.

They briefly discussed SrA JS's medical issue and then SrA JS decided the Appellant needed to leave. She went to her room to retrieve Appellant's slippers, threw his slippers into the living room, shut her bedroom door, and got back into bed. Appellant responded by coming into the room and stating in an aggravated tone that "no one tells [him] when to leave." Appellant then got back into bed with SrA JS and attempted to grab her. SrA JS responded by calling her roommate, Amn BG. SrA JS told Amn BG that Appellant was at their apartment and would not leave. Overhearing this conversation, Appellant got off the bed, put on his clothes, and told SrA JS that she had ruined his

career. Appellant then threw SrA JS's purse against the closet and her pillow against a vase sitting on a windowsill.

Soon after the call to Amn BG, Appellant left the apartment. During a subsequent phone call minutes later, SrA JS told Amn BG about what had happened in the apartment, specifically that Appellant had forced her down on her mattress, pulled her pants off, and forced her to have sex with him. Although SrA JS was initially reluctant to report a sexual assault, Amn BG called the Sexual Assault Response Coordinator (SARC) hotline to report the sexual assault and was referred to a victim advocate. A victim advocate was dispatched to SrA JS's apartment and, along with another Airman, they escorted SrA JS to a medical clinic where a SANE exam was completed.

## II. DISCUSSION

### A. Factual and Legal Sufficiency.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of [Appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.A.A.F. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324; *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The Specification of the Charge alleges Appellant raped SrA JS in violation of Article 120, UCMJ, 10 U.S.C. § 920. To sustain a conviction for rape, the prosecution was required to prove: (1) that Appellant committed a sexual act

upon SrA JS by causing penetration of her vulva with his penis; and (2) that Appellant did so by using unlawful force. "Unlawful force" means an act of force done without legal justification or excuse. "Force" means the use of a weapon; the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or inflicting physical harm sufficient to coerce or compel submission by the alleged victim. Article 120(g)(5-6), UCMJ, 10 U.S.C. § 920(g)(5-6).

The primary evidence supporting the rape conviction came from SrA JS's testimony that Appellant penetrated her vagina with his penis and that just prior to the sexual act, Appellant pulled off her pants and underwear, pinned her arms down, and pried her legs open with his legs despite the fact that she was squeezing her legs together. Her testimony established that through his use of physical strength, Appellant had both restrained (pinning down her arms) and overcome (prying her legs apart) SrA JS. Additionally, phone records corroborated SrA JS's testimony about the multiple phone calls made to and from her phone number that night. Amn BG testified to the distress in SrA JS's voice as she described how Appellant would not leave the apartment. She also relayed what SrA JS had told her about Appellant forcing her to have sex with him. Finally, evidence of Appellant's fresh physical injuries corroborated SrA JS's testimony about her efforts at resistance.

At trial, Appellant argued that SrA JS had a motive to fabricate the claim of rape because she was angry at Appellant over his past relationship with Amn CG, his failure to listen to her medical concerns on 1 December 2013, and because their relationship had not evolved into a long-term one as she had hoped. Trial defense counsel through cross-examination also implied that SrA JS fabricated the claim of rape in order to get an expedited transfer from Joint Base San Antonio to Joint Base Lewis–McChord near her family. Notwithstanding these arguments attacking the credibility of SrA JS, the testimony and supporting evidence clearly show Appellant committed the alleged act and prove the elements of the offense as charged. We find there is sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that the Appellant is guilty of the offense of rape and that the evidence is, therefore, legally sufficient. Furthermore, after our independent review of the record and making allowances for not personally observing the witnesses, we are ourselves convinced beyond a reasonable doubt.

## B. Admission of Victim's Statements to the Sexual Assault Nurse Examiner (SANE) under Mil. R. Evid. 803(4)

Appellant next avers that the military judge abused his discretion when he admitted SrA JS's hearsay statements to the SANE, Ms. KC, as statements made for the purposes of medical diagnosis or treatment. While we agree that

the military judge did abuse his discretion in admitting these statements under Mil. R. Evid. 803(4), we nonetheless conclude they were admissible as prior consistent statements under Mil. R. Evid. 801(d)(1) and thus the error was harmless. Further, we find that the statements did not have a substantial influence on the findings.

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Donaldson,* 58 M.J. 477, 482 (C.A.A.F. 2003). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *Id.* (quoting *Humpherys,* 57 M.J. at 90). Statements offered as exceptions to the hearsay rule under Mil. R. Evid. 803(4) are admissible if two conditions are met: "First the statements must be made for the purposes of 'medical diagnosis or treatment'; and, second, the patient must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought.'" *United States v. Edens,* 31 M.J. 267, 269 (C.M.A. 1990) (quoting *United States v. Deland,* 22 M.J. 70, 75 (C.M.A. 1986)).

In a session held outside the members' presence under Article 39(a), UCMJ, 10 U.S.C. § 839(a), and prior to the SANE, Ms. KC, testifying before the members, the military judge heard her testimony about the examination of SrA JS. Counsel for both sides argued to what extent the purpose of receiving the statements were for medical diagnosis and treatment versus for the collection of evidence. The military judge overruled the defense hearsay objection finding that Ms. KC received information from SrA JS for the purpose of medical treatment and diagnosis. Specifically the military judge stated:

> All right. I am going to overrule the objection of the defense, and I will state some of my basis for that. Ms. [KC] stated that she conducts her examination for medical treatment and diagnosis and she gets information from the patient, obtains history, and she says that this information and history can be used for forensic purposes, but primarily it's used for medical diagnosis and treatment. Although the ER doctor does treat the patient, in this case [SrA JS], that ER doctor does it for trauma valuation and not for the treatment and diagnosis that Ms. [KC] does. I also don't think it matters that she can prescribe medication, as was alluded to by the defense through your questioning. That is not one of the requirements; that the person has to be a doctor. In fact, I think the rule potentially is broad enough that it contemplates non-medical personnel being able to fit under this exception. So that was a little drawn out. I just needed to kind of understand the issue better, but I am overruling the exception -- excuse me. I am overruling the objection of defense.

While the military judge properly focused on and made a determination regarding the purpose for which the statements were being elicited by the SANE, it does not appear to us that he made a determination as to the second prong of the *Edens* test that "the patient must make the statement with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought." "While both requirements must be met, the 'critical question [in this inquiry] is whether [the patient] had some expectation of treatment when she talked to the caregivers.'" *Donaldson*, 58 M.J. at 485 (quoting *United States v. Haner,* 49 M.J. 72, 76 (C.A.A.F. 1998)). "The key factor in determining whether a particular statement is embraced by the medical-treatment exception is the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *Id.* (internal quotation marks and citations omitted). As the military judge failed to consider the "critical question" regarding the expectations of SrA JS, his decision to admit the evidence was influenced by an incomplete and, therefore, erroneous view of the law.

Further, direct evidence from SrA JS contradicts a subjective expectation of medical benefit. Asked during direct examination why she was going to the clinic at that point, SrA JS responded she "going for [her] SANE exam" and that it is was Amn BG who said she should get the exam. SrA JS did not express any concern over injury, pregnancy, or the possibility of a sexually transmitted disease as a reason for her seeking the forensic medical examination. In fact when asked during cross-examination whether "it [was] important to give the nurse an accurate recollection of what happened because the *purpose of it [was] to collect evidence*," SrA JS replied "yes." (Emphasis added).

In their brief, the Government cites *United States v. Cucuzzella,* 66 M.J. 57 (C.A.A.F. 2008), and correctly points out that a patient's expectation of receiving medical treatment may be established solely by the testimony of the treating medical professional and may be based other circumstantial evidence even when a patient has claimed an alternative purpose. The military judge in *Cucuzzella* however, in contrast to the military judge in this case, made a finding pursuant to the second prong of the *Edens* test that the declarant made a statement to a counselor with the expectation of receiving treatment. Further, in *Cucuzzella*, the declarant had, prior to the date of the statement in question, already established a client-counselor relationship with the witness. Finally, the declarant testified that she believed the witness was "somebody to provide counseling." *Id.* at 61. In that case, the court found that the military judge's finding was not clearly erroneous. *Id.* at 62.

In contrast, here, the military judge made no finding as to SrA JS's state of mind with regard to receiving medical benefit or treatment, SrA JS agreed in

her testimony that the purpose of the examination was to collect evidence, and the greater context of the visit to the clinic and subsequent activity that morning was to report a claim of sexual assault. Given the lack of a finding regarding SrA JS's expectation for treatment and that the greater weight of the record tends to show SrA JS was simply engaged in reporting a sexual assault in accord with the recommendations of others, we find that the military judge abused his discretion in admitting the statements made by SrA JS to the SANE under Mil. R. Evid. 803(4).

Although we have found that it was error in this case to admit the statements of SrA JS to the SANE under the hearsay exception for statements made for medical diagnosis or treatment, we nonetheless conclude that such error was harmless as the statements were properly admissible as prior consistent statements. A prior consistent statement is not hearsay if it is "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Mil. R. Evid. 801(d)(1)(B).

Military courts have:

> consistently interpreted the rule to require that a prior statement, admitted as substantive evidence, precede any motive to fabricate or improper influence that it is offered to rebut. Where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut.

*United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998). During cross-examination, defense counsel questioned SrA JS about her permanent change of station move from Joint Base San Antonio to Joint Base Lewis–McChord near Seattle, Washington, and how that was connected to her claim of sexual assault. The implication made was that SrA JS had fabricated the sexual assault claim in order to be eligible to request a humanitarian transfer as a victim of sexual assault. The record, however, supports a finding that SrA JS was not aware of this specific program for sexual assault victims until after she was examined by the SANE. Lacking knowledge of the program when she made her statement about the sexual assault to the SANE, the statement preceded the motive to fabricate in order to effect a transfer to another military installation.

Further, even were we to assume that SrA JS's statement to the SANE was not admissible under any rule or theory, we nonetheless determine the admission of the statement was harmless. A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused. Article 59(a)

UCMJ, 10 U.S.C. § 859. For a non-constitutional error[1] such as this one, the Government has the burden of demonstrating that "the error did not have a substantial influence on the findings." *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003). We evaluate whether erroneous admission of Government evidence is harmless using a four-part test, weighing: (1) the strength of the Government's case, (2) the strength of the Defense's case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question. *United States v. Berry*, 61 M.J. 91, 98 (C.A.A.F. 2005).

As discussed in our legal and factual sufficiency analysis, the Government's case was strong, especially considering the victim's contemporaneous report of the sexual assault to her roommate, subsequent report to law enforcement, as well the phone records that corroborated multiple details of her testimony. The Defense's case consisted primarily of a proffered motive to fabricate rooted in revenge to quell SrA JS's anger over the state of her relationship with Appellant and to point out a number of minor inconsistencies in her prior statements. The evidence in question was a relatively brief account of the sexual assault and was cumulative with SrA JS's testimony at trial as well the testimony of Amn BG. Further, it was not the only evidence of a fresh complaint of sexual assault. For these reasons, our review of the record shows the statements made to the SANE were of marginal value and that any error did not did not have a substantial influence on the findings.

## C. Trial Counsel's Findings Argument.

Appellant next asserts trial counsel made improper argument during findings. Specifically six arguments, none of which were objected to by trial defense counsel, are alleged to have been improper: (1) mischaracterizing a prior uncharged sexual act between Appellant and victim as a rape and the Appellant as a rapist; (2) offering commentary on the "truth or falsity or credibility" of testimony; (3) engaging in a personal attack upon Appellant calculated to inflame the passions of the members; (4) arguing facts not in evidence; (5) testifying during argument; and (6) mispresenting evidence coupled with misstating the law.

Improper argument is a question of law that is reviewed de novo. *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011). Because there was no objection

---

[1] To the extent that the "statements were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and thus testimonial under *Crawford v. Washington,* 541 U.S. 36 (2004), we note that the declarant, SrA JS, testified at trial. Therefore, Appellee was afforded an opportunity for cross examination and the Confrontation Clause was satisfied.

at trial, we review the propriety of trial counsel's argument for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013). To prevail under a plain error analysis, Appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (quoting *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). In assessing prejudice, we evaluate the cumulative impact of any prosecutorial misconduct on Appellant's substantial rights and the fairness and integrity of his trial. We do so by balancing three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction. *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005).

### 1. Mischaracterizing a Prior Uncharged Sexual Act Between Appellant and Victim as a Rape and the Appellant as a Rapist

Trial defense counsel exhaustively cross-examined SrA JS on the sexual encounter between her and Appellant that occurred on 1 December 2013 in order to point out her prior inconsistent statements about that event. SrA JS had made prior out-of-court statements describing the incident as consensual because she gave in to having sex with Appellant, but by the time of trial believed it to be nonconsensual. In an effort to explain the inconsistency in these statements of SrA JS, trial counsel made an analogy to the typical hapless investor in a Ponzi scheme, who only after he learns that his financial advisor has cheated others, realizes that he too may have been taken advantage of. The primary point to be made is that events often take on additional meaning with the passage of time, subsequent events, and critical hindsight. This was a proper attempt to explain inconsistent statements by a witness regarding whether she believed a past sexual act was consensual or not in light of a subsequent sexual act with the same person that she firmly believed was nonconsensual. Therefore it was not an improper attempt by the prosecutor to prove and argue that the prior sexual act was rape, that Appellant was a rapist, and was therefore guilty of the charged offense. We find no error with this argument, plain or otherwise.

### 2. Offering Commentary on the "Truth or Falsity or Credibility" of Testimony

The assertion that trial counsel engaged in improper vouching of SrA JS is based on the same part of the argument just discussed. Improper vouching occurs when the trial counsel places the prestige of the Government behind a witness through personal assurances of the witness's veracity. *Fletcher*, 62 M.J. at 180. After arguing the Ponzi scheme analogy, trial counsel argued essentially that the prior inconsistent statements were "not lying" but "a young

woman trying to make sense of what happened to her." This was an appropriate argument in response to the attack on the witness's credibility. It was not an example of improper vouching and did not rise to the level of plain error.

### 3. Personal Attack upon the Appellant Calculated to Inflame the Members

Appellant next asserts that trial counsel personally attacked Appellant and inflamed the members by stating Appellant was using SrA JS for sex and treating her like a "piece of meat." A well-chosen metaphor is not only a highly useful literary device, but a powerful arrow in the trial advocate's quiver. With a few short words, the metaphor that hits its mark surely stings the party opponent and likewise leaves an indelible impression on the fact-finder. In communicating sexual objectification of one by another, the expression "treat another as a piece of meat" accomplishes that end. It is well established that while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *United States v. Frey*, 73 M.J. 246, 248 (C.A.A.F. 2014) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The question here is whether this was merely a hard blow or foul. We find it was not obviously foul.

Context matters.[2] Immediately preceding the use of the metaphor at issue, trial counsel was addressing one of the defense-asserted motives to fabricate and attacks on the credibility of SrA JS—that she was angry over a lack of attention from Appellant. Trial counsel then highlighted that of 59 calls between Appellant and SrA JS, Appellant had initiated 54 of those calls, the implication being that SrA JS was not seeking attention from Appellant at that time. Trial counsel then characterized those calls as Appellant's treatment of SrA JS as "a piece of meat." Whether one assertion neatly followed from the other is hard to say, but in the starkest of terms, a "friends with benefits" relationship, as it was between Appellant and SrA JS in this case, could be argued as a mutual agreement between two people to treat each other as a "piece of meat" for the express purpose of mutual sexual gratification. In any event, this dynamic of the relationship between Appellant and the victim was most assuredly relevant on the issue as to whether Appellant committed the sexual act by unlawful force. And even were we to assume that the metaphor was an improper personal attack or unduly inflammatory, we do not find the one-time use in the entirety of the argument so obviously improper as to merit relief in

---

[2] "Argument by a trial counsel must be viewed within the context of the entire court-martial. The focus of our inquiry should not be on words in isolation but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)).

the absence of an objection from counsel. Thus, while trial counsel's use of the metaphor was perhaps a flaming arrow, it does not rise to the level of plain error.

### 4. Arguing Facts Not in Evidence

The military judge admitted evidence of past consensual sex acts between Appellant and SrA JS that included what may be characterized as "rough sex." SrA JS testified that during those consensual "rough sex" encounters, Appellant was the aggressor engaged in hair pulling, slapping and choking. In his argument, trial counsel pointed out during those consensual "rough sex" sessions, Appellant was the one exhibiting the controlling behaviors. Trial counsel further argued that during the charged incident, SrA JS fought back in contrast to the consensual "rough sex." The characterization of Appellant as the one exerting control during consensual rough sex was a fair inference from the evidence. Trial counsel identified SrA JS's fighting back and attempt to assert control as a key difference on the charged occasion that negated both consent and any mistake of fact by Appellant. This was proper argument.

### 5. Testifying During Argument

Appellant argues that it was improper for trial counsel, when commenting on SrA JS's description of how the rape occurred, to state "that's how rapes occur, that's exactly how rapes occur," and to argue what was common sense and knowledge of human nature. "As case law and the Military Judge's Benchbook have long recognized, members are expected to use their common sense in assessing the credibility of testimony as well as other evidence presented at trial." *Frey*, 73 M.J. at 250. Appellant's claim is essentially that trial counsel's argument went beyond common knowledge and sense and crossed over to either trial counsel testifying or arguing facts not in evidence. We disagree based on the facts of this case.

### 6. Misrepresentation of Evidence Coupled with a Misstatement of Law

Finally, Appellant argues that trial counsel misrepresented the testimony of Ms. KC during his argument and further exacerbated that error by misstating the military judge's instruction regarding a statement made for medical diagnosis or treatment. While Appellant is correct that trial counsel did not provide a verbatim recollection of what Ms. KC testified to with regard to what SrA JS told her about the sexual assault, he did provide a substantially accurate summary of the key details.

Without objection from trial defense counsel, the military judge provided the court members the following evidentiary instruction regarding the hearsay statement made by SrA JS to Ms. KC:

> There has been evidence that Senior Airman JS made the statements concerning the alleged offense to Ms. KC during a sexual assault forensic examination. The law recognizes that a patient seeking diagnosis or treatment from a medical professional has an incentive to be truthful because if she believes that by telling the truth that she will facilitate the medical provider's task of medical diagnosis and/or treatment. Whether the statement was made or related to medical diagnosis and treatment is for you to decide. The significance, if any, to be attached to such statements are matters for your determination -- I'm sorry, for determination by you.

Appellant argues trial counsel's characterization of the military judge's instruction as "[t]hat's the law telling you when someone says something to a medical provider you can take that statement for the truth of what's being said" was a misstatement of the law. Contrary to Appellant's contention, this is an accurate statement of the law. It is another way of saying that the testimony can be used for substantive purposes. To be sure, the evidence was not admitted subject to a limited purpose other than its truth. It was offered for the truth of the matter asserted and admitted by the military judge under the medical treatment exception to hearsay rule. And although we found that admission per that exception to be in error, we concluded that the statement was nonetheless admissible as a prior consistent statement. In both instances, the evidence may be considered for substantive purposes. As such, this argument, to which trial defense counsel did not object, was not plain error and did not prejudice Appellant.

## D. Post-trial Processing Delay; 177 Days to Convening Authority Action

Finally, Appellant argues that he should receive day-for-day confinement credit in the amount of 57 days due to an unreasonable post-trial delay. In this case, the convening authority took action 177 days after the announcement of sentence and the end of trial. There is a presumption of unreasonable post-trial delay when the convening authority does not take action within 120 days of trial. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Appellant, however, does not alleged a due process violation, but urges this court to exercise its power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for the post-trial delay in this case. *United States v. Tardif*, 57 M.J. 219, 224

(C.A.A.F. 2002). In making our assessment, we are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being dispositive.[3] In their explanation of the reasons for the delay, the Government proffers that most of the delay occurred during the transcription of the proceedings and that the installation court reporters were already tasked with five other general court-martial proceedings to transcribe at the time Appellant's trial. Within a week of the trial, a request for external court reporter assistance was made. The Government also notes that by the time Appellant had submitted his clemency request, there were new legal personnel who appropriately took additional time to familiarize themselves with the case prior to preparing and signing the addendum to the Staff Judge Advocate Recommendation. We find no evidence of bad faith or gross indifference to the post-trial processing of this case. Having considered and weighed all the *Gay* factors, we conclude no extraordinary exercise of our Article 66(c), UCMJ, authority is warranted.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[3] These factors include: (1) How long the delay exceeded the standards set forth in *Moreno*; (2) What reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, whether there is nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay; (4) Whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline; (5) Whether there is any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) Given the passage of time, whether this court can provide meaningful relief in this particular situation.