# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 40581**

_____

**UNITED STATES**
*Appellee*

**v.**

**Anton SOLOSHENKO**
Specialist 4 (E-4), U.S. Space Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 31 July 2025

_____

*Military Judge*: Wesley A. Braun.

*Sentence*: Sentence adjudged on 21 September 2023 by GCM convened at Buckley Space Force Base, Colorado. Sentence entered by military judge on 27 October 2023: Dishonorable discharge, hard labor without confinement for 15 days, and reduction to E-3.

*For Appellant*: Major Heather M. Bruha, USAF; William E. Cassara, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, MERRIAM, and WARREN, *Appellate Military Judges*.

Judge MERRIAM delivered the opinion of the court, in which Chief Judge JOHNSON and Judge WARREN joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

MERRIAM, Judge:

A general court-martial consisting of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The members sentenced Appellant to a dishonorable discharge, hard labor without confinement for 15 days, and reduction to E-3. The convening authority took no action on the findings or sentence.

Appellant raised four issues on appeal, which we have rephrased: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether the military judge abused his discretion in admitting statements of the complaining witness under the excited utterance exception to the hearsay rule; (3) whether 18 U.S.C. § 922 is constitutional as applied to Appellant when Appellant was convicted of non-violent offenses; and (4) whether Appellant's constitutional rights were violated by being convicted of offenses by a court-martial panel that was not required to vote unanimously for guilt.[3]

We have carefully considered issue (3) and find it warrants neither discussion nor relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)); *see also United States v. Johnson*, __ M.J. __, No. 24-0004, 2025 CAAF LEXIS 499 (C.A.A.F. 24 Jun. 2025) (Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*), does not give this court authority to modify the 18 U.S.C. § 922 indication on an entry of judgment); *United States v. Williams*, 85 M.J. 121, 126 (C.A.A.F. 2024) (whether a conviction triggers 18 U.S.C. § 922 is not part of the findings or sentence upon which Courts of Criminal Appeals have authority to act under Article 66(d)(1)(A), UCMJ (2024 *MCM*)).

As to issue (4), Appellant is not entitled to relief. *See United States v. Anderson,* 83 M.J. 291, 302 (C.A.A.F. 2023) (holding that a military accused does not have a right to a unanimous verdict under the Sixth Amendment,[4] the Fifth

---

[1] Unless otherwise noted, all references to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of assault consummated by battery in violation of Article 128, UCMJ, 10 U.S.C. § 928. A second specification of assault consummated by battery was withdrawn and dismissed with prejudice by the Government prior to arraignment.

[3] Issue (4) was personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] U.S. CONST. amend. VI.

Amendment's Due Process Clause, or the Fifth Amendment's component of equal protection[5]), *cert. denied*, 144 S. Ct. 1003 (2024).

We address issues (1) and (2) below. Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

### A. Consensual Sexual Relationship Between LH and Appellant

In June 2022, Appellant, then 21 years old, met LH, an 18-year-old civilian, on a dating application and began a short relationship with her. In the following few weeks, they frequently engaged in consensual rough sex. At LH's request, Appellant intentionally caused LH pain, including by spanking her, because LH enjoyed the sensation of feeling pain during sex.[6] The record indicates sometimes LH would ask Appellant to "do it harder" to cause more pain for her sexual gratification. And LH testified at trial that sex involving pain was "almost the only type of sex" they had. At least once, Appellant left "considerable marks" on LH's breasts. Approximately 75 percent of their consensual sexual encounters involved Appellant, at LH's request, enhancing LH's sexual pleasure and gratification by making it difficult for her to breathe.

When not physically together, LH and Appellant communicated their sexual interests and fantasies to each other by text message.[7] LH told Appellant he should: (1) have sex with her "dirty, hot, rough, and deep;" (2) spank her because she had been "real bad;" and (3) handcuff or tie her up and "make" her perform sex acts on him, the thought of which she explicitly acknowledged made her sexually aroused.

On 7 July 2022, when Appellant and LH were texting about sexual desires, LH sent Appellant a message saying, "I want you to stop, but I really don't want [you] to all at the same time." Later that day they had consensual rough sex, after which LH perceived a shift in Appellant's mood. Appellant told LH he felt like "a withered husk," referring to being exhausted and uninterested in continuing to engage in sex with her in the way she desired. Appellant further told LH that sex with her was making him tired and depressed. On 8 July 2022, LH and Appellant again discussed "concerns about [their] sexual compatibility." Appellant communicated his willingness to continue having sex with LH, but expressed that he could not take LH "home to his mother." On 9 July 2022, LH sent Appellant a text ending their relationship because in her

---

[5] U.S. CONST. amend. V.

[6] We include these personal and intimate details because they are relevant and necessary to analyzing Appellant's mistake of fact defense, as analyzed in detail *infra*.

[7] All quotes from text messages are in their original form, except where bracketed.

view they were "not compatible . . . anymore" and she was "just not that into" him.

After the 9 July 2022 text exchange, Appellant and LH did not meet or have sex for several days. In the meantime, LH had sex with another man on 11 July 2022. She also went to see her therapist, who advised her to remain celibate for a period. LH acknowledged she had previously failed to follow other advice from her therapist. At trial, however, LH asserted that on this occasion she intended to make a real change and had resolved to be celibate.

On 19 July 2022, Appellant sent LH text messages saying he missed her and "[t]hings should not have gone the way they did." LH responded saying, "[N]o they shouldn't have I miss you too" and "Im [sic] sorry that I said what I did, it wasn't true and that was sh[**]ty of me." Appellant and LH then arranged to meet at Appellant's home that night. LH told Appellant, "I want to make sure this is not like a booty call thing, right[.]" Appellant replied "It's not."[8]

## B. Events Leading to the Article 120, UCMJ, Offense

On the evening of 19 July 2022, LH arrived at Appellant's home as planned. According to LH, they first sat on Appellant's couch and engaged in small talk. Eventually, Appellant started to kiss LH. She told him, "I'm trying to be celibate and not do anything sexual in nature and I just want to let you know this is as far as it's going to go[,] it's PG, that's it."[9] Appellant responded that was "fine." LH was a willing and active participant in the kissing because, according to her, "emotions were high" and she believed kissing was not as intimate as sex. They talked for a few more minutes about how their relationship had previously ended and they apologized for the hurtful things they said to each other.

Appellant then started showing LH some new furniture around his home. She followed him into his bedroom where he showed her new nightstands. LH testified she was more focused on their conversation than the fact they were headed into the bedroom. Appellant and LH started kissing again on Appellant's bed. LH told Appellant, "This is as far as it's ever going to go." Appellant responded that "it was fine." Appellant began kissing LH more aggressively while laying on top of her. He eventually started to, in LH's words, "move his

---

[8] At trial, LH clarified on cross-examination, that she considered the term "booty call" to mean being invited for the sole purpose of having sex outside of a relationship, whereas an invitation to come over for the sole purpose of sex during a relationship would not be a "booty call."

[9] "PG" is apparently a reference to the Motion Picture Association's movie ratings system suggesting the suitability of films for various audiences. LH testified that to her "PG" meant kissing only.

hands to other places that wasn't okay." According to LH, she stopped kissing Appellant back at this point and was "[j]ust kind of was there." Appellant started pushing down on LH's face, causing her to feel like she could not breathe. LH testified that at times she could not talk, but managed to say "no" 20 to 30 times while Appellant was kissing and groping her. LH tried to stop the kissing by putting her hand over his mouth and her mouth, but Appellant moved her hand out of the way. When Appellant started to take off his shirt, LH pulled it back down, saying words to the effect of, "If you take your shirt off, this is going to go to the next place." Nevertheless, Appellant eventually removed his shirt anyway. LH tried to place the shirt between their faces, but Appellant moved it out of the way and resumed kissing her.

Appellant told LH he knew she "wanted it" and either "told" or "asked"[10] LH to take off her clothes. At this point, LH believed Appellant wanted to have sex with her. LH removed her jeans, underwear, shirt, and bra, and testified she did so out of fear that Appellant "would make" the situation "more violent" than "it already was." At trial, LH testified Appellant was "overpowering" her, she "couldn't really get away" and she "felt like [she] didn't have any other choice than to do what he asked" as the situation, in her view, "kept escalating further."

Appellant did not threaten LH, however. She testified at trial that she clearly recalled removing all her own clothing without Appellant's assistance, but she could not remember whether Appellant touched her while she did so.

While LH was laying naked in bed, Appellant got up to retrieve a condom from the nightstand. When Appellant returned, he moved LH's legs apart and penetrated her vulva with his penis. Appellant also bit her neck and one or both of her breasts.[11] LH testified this caused her "extreme pain" and she "made noises [of] pain," but did not physically resist or tell Appellant to stop penetrating her because she felt "frozen." LH estimated Appellant's penetration of her vulva lasted about 15 minutes. From the time Appellant "told" (or "asked") LH to take her clothes off until the penetration was over, she did not

---

[10] LH used both terms during her testimony on direct examination and neither trial counsel nor trial defense counsel requested clarification. During a cross-examination in which LH regularly challenged and pushed back on the language and premises of trial defense counsel's questions, she did not challenge trial defense counsel's multiple questions about the circumstances when Appellant "asked" her to take her clothes off.

[11] LH testified she could not remember whether Appellant bit one or both breasts. The panel acquitted Appellant of a separate charge and specification alleging his biting her breast constituted an assault consummated by a battery in violation of Article 128, UCMJ.

say "no" or "stop" or otherwise express verbally that she did not consent to penetration.

Afterwards, according to LH's testimony, Appellant laid his head on LH's chest and acted "affectionate" toward her, which she found "highly confusing." Appellant asked LH how she was feeling. She responded by asking him if he wanted to hear the truth or a lie. After Appellant told her he wanted to hear the truth, she said that she did not feel okay. Appellant responded by telling her she did not need to feel bad about breaking her promise to be celibate because it was "all him."

**C. Aftermath**

LH got dressed and laid down on Appellant's couch. Appellant seemed to detect LH was still bothered by something. He asked her if she was upset because of her intent to remain celibate. LH revealed she had also had sex with another man on 11 July 2022—two days after breaking up with Appellant.

LH remained at Appellant's apartment for 45 to 60 minutes. She then walked to her car while "processing what happened." LH then telephoned SS, a close family friend, as she began to grasp the "extent of what happened" and "started putting it together . . . [a]nd realizing how bad it was." LH was crying during her conversation with SS.

LH then briefly called her sister and her mother before driving to her mother's home where she started crying again. LH had a contentious relationship with her mother who had recently told LH she could no longer live in her home because she was not following her rules. LH was planning to sleep in her boss's basement the night the incident occurred, but her mother permitted her to stay the night at her home. At some point, LH revealed to her mother some details of what had happened.[12] LH's mother told her she needed to go to the hospital if she had been sexually assaulted.

Later that night, Appellant sent LH two text messages to which LH did not respond. First, Appellant wrote, "come back I'm horny." In a separate text, he wrote he was just kidding and wished her a good night. It had been the usual practice for Appellant to engage in "multiple rounds of sex" with LH "almost every time." This time, however, LH did not respond to his request that she return, because, according to her trial testimony, she believed Appellant "had just sexually assaulted" her and she believed "there is no response" to a request to return after such an encounter.

The next day, 20 July 2022, Appellant texted LH, "Good morning. Hope you don't hate me too much." LH again did not respond. LH went to work that day.

---

[12] The record is unclear exactly what LH told her mother about the sexual assault or when she told her.

After she finished her shift, she went to the hospital for a forensic sexual assault exam by a nurse examiner. The nurse examiner took photographs, some depicting marks on LH's neck and breast. LH told the nurse examiner there was no history of Appellant threatening her or inflicting injury on her before the night of the alleged assault. LH told the nurse examiner Appellant had made it difficult for her to breathe during the sexual act on 19 July 2022, but did not reveal to the nurse examiner that Appellant had also previously done this at her request in most of their prior consensual sexual encounters.

After LH told her mother that she had reported the sexual assault, visited the hospital, and spoken with the police, her mother rescinded LH's eviction and allowed her to return to staying at home.[13]

## D. LH's Testimony at Appellant's Trial by Court-Martial

LH testified for the Government at Appellant's trial by court-martial. Appellant exercised his right to remain silent and elected not to testify.

On direct examination, LH described Appellant spreading her legs before penetrating her vulva with his penis on the night in question. LH did not allege that Appellant used force to do so. Then, on cross-examination, LH stated for the first time that Appellant had "forced" her legs open.

During cross-examination of LH, trial defense counsel pressed LH as to why she had not previously disclosed this supposed "force" to the sexual assault nurse examiner, two police detectives, or the prosecution team, or why she did not testify about this "force" in her initial direct examination. LH answered, "No one's ever asked."[14] Further, LH admitted that on 4 July 2022 she showed her mother injuries to her breasts and complained Appellant caused them, then on the two subsequent days communicated to Appellant by text her desire for rough sex.

During another part of cross-examination, LH acknowledged that she never revealed her history of consensual "rough sex" with Appellant to the nurse examiner or police investigators, and did not disclose it to the prosecution team until two days before trial. This late disclosure happened after the Defense questioned LH about certain text messages between her and Appellant showing the consensual nature of their prior sexual relations. In particular, on cross-examination, when trial defense counsel sought to establish that

---

[13] For reasons not explained in the record and apparently not germane to the case, this arrangement lasted only a few days before LH's mother again told LH she could no longer live in her home.

[14] When asked during further cross-examination to specify whether her use of the word "force" meant she physically resisted Appellant spreading her legs, LH answered, "I froze so, I just froze, and I just laid there, and he opened them."

LH had deleted a supposedly exculpatory message from Appellant, LH claimed she never received such a message. LH testified she had not blocked incoming messages from Appellant on her phone, then moments later testified that she did not know whether she had blocked him, then shortly thereafter testified she had temporarily blocked him, then unblocked him at police direction. When trial defense counsel confronted LH about her changed testimony, LH responded, "I had forgot because there was a lot of instructions specifically about blocking and unblocking."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of the sole conviction for sexual assault. Appellant asserts legal and factual insufficiency of both the Government's proof regarding the essential elements of the offense of sexual assault and Appellant's mistake of fact defense.

#### 1. Law

##### a. Legal Sufficiency

We review issues of legal sufficiency de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "Our assessment of legal sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, 85 M.J. 213, 227 (C.A.A.F. 2024) (internal quotation marks and citation omitted).

##### b. Factual Sufficiency

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and (2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J.

127, 129 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>>
>> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (second and third alteration in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.* at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id*. Second, we "must be clearly convinced of the correctness of this decision." *Id.*[15]

---

[15] We note a perplexing interaction between the two parts of this standard. To find the evidence proves Appellant's guilt beyond a reasonable doubt, we must be "firmly convinced" of Appellant's guilt. *See, e.g.*, *Military Judge's Benchbook*, Dept. of the Army Pamphlet 27-9 at 1825 (29 Feb 2020); *United States v. McClour*, 76 M.J. 23 (C.A.A.F.

### c. Sexual Assault

As charged, the elements for sexual assault are: (1) Appellant committed a sexual act upon LH by penetrating LH's vulva with Appellant's penis; and (2) Appellant did so without LH's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). As relevant here, a "[s]exual act" is defined as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A). "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A).

"An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *Id.*

"All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C). "A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

### d. *Mistake of Fact*

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Article 120(f), UCMJ, 10 U.S.C. § 920(f), makes clear an accused may raise any applicable defenses under the Rules for Courts-Martial to a charge of violating that Article. Therefore, an honest and reasonable mistake that the victim consented to the charged sexual assault is an affirmative defense to the charged offense. *See*, *e.g.*, *McDonald*, 78 M.J. at 379 (considering the defense of mistake of fact to a charge of sexual assault).

---

2017) (noting the *Benchbook* instruction, including the "firmly convinced" standard). So, it appears that for us to take action under the new Article 66(d)(1)(B), UCMJ, standard as interpreted by our superior court in *Harvey*, we must be "clearly convinced" that we are *not* "firmly convinced" of Appellant's guilt.

While the quantity of evidence required to raise the mistake of fact defense is low, the record must contain at least some evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citation omitted) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

In a sexual assault case, it is an affirmative defense to the charged offense that the accused had an honest and reasonable mistake of fact that the victim consented to the charged sexual act. *See*, *e.g.*, *McDonald*, 78 M.J. at 379. A reasonable mistake of fact cannot be based upon the negligent failure by an Appellant to discover the true facts. *See United States v. Lee*, No. ACM 39531 (f rev), 2020 CCA LEXIS 61, at *22 (A.F. Ct. Crim. App. 26 Feb. 2020) (unpub. op.) (citing *McDonald*, 78 M.J. at 379) ("[I]n this case, as in *McDonald*, the military judge properly instructed the members that any mistake of fact as to [the victim's] consent must have been non-negligent."). Negligence, in turn, is the absence of due care. When determining what is reasonable, "'[d]ue care' is 'such care as would be exercised by an ordinarily prudent [person] when sober.'" *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.) (quoting *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952); then citing RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (AM. LAW INST. 1965) (if a drunken person's "conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse" conduct that would otherwise be negligent)), *rev'd on other grounds*, 83 M.J. 408 (C.A.A.F. 2023); *see also United States v. Moore,* No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim App. 11 Dec. 2018) (unpub. op.) (citation omitted) ("This defense has two elements: one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult."). The Government bears the burden to prove beyond a reasonable doubt that the accused did not form a reasonable belief that he had obtained consent. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 381.

### 2. Analysis

#### a. Legal Sufficiency

The evidence introduced by the Government at trial meets our standard of review for legal sufficiency. LH testified that Appellant penetrated her vagina

with his penis and did so without her consent. She further testified that prior to the penetration she explicitly expressed her lack of consent to Appellant's escalation of physical contact beyond kissing. She told him she intended to remain celibate, that kissing was "as far as it's going to go," and that their activities would remain "PG." She subsequently testified that while Appellant was kissing her in an increasingly insistent and aggressive manner, "[she] said no probably about 20 to 30 times" with "no exaggeration there." LH further testified that prior to penetration she attempted to prevent Appellant from removing his shirt and placed her hand between his mouth and her own mouth in an attempt to prevent further unwanted kissing and otherwise resist Appellant's advances. Viewing the evidence in the light most favorable to the Prosecution, *Robinson*, 77 M.J. at 297–98, and drawing every reasonable inference from the evidence of record in favor of the Prosecution, *Barner*, 56 M.J. at 134, we conclude a rational trier of fact could have found the essential elements of the crime and the Government's refutation of Appellant's mistake of fact defense beyond a reasonable doubt.

### b. Factual Sufficiency

On appeal, Appellant claims two specific deficiencies of proof. First, Appellant argues the Government did not prove the elements of the offense of sexual assault beyond a reasonable doubt at his court-martial, where establishing Appellant's guilt depended heavily on the court members crediting LH's testimony as truthful. According to Appellant, LH was an "unreliable and dishonest witness" who had "multiple motives to fabricate" and, therefore, a conviction mainly supported by her testimony was factually insufficient. Second, Appellant argues the Government did not disprove Appellant's mistake of fact defense beyond a reasonable doubt. Specifically, Appellant contends LH's "words and conduct during the sexual assignation, coupled with Appellant's knowledge of LH's preference for rough sex led Appellant to honestly believe that she consented to vaginal intercourse."

### i) Appellant's Contention that Evidence of Offense was Insufficient

Appellant's assignments of error include the requisite specific showing of a deficiency of proof under each theory to merit our review. *See* Article 66(d)(1)(B), UCMJ (2024 *MCM*). Therefore, we proceed to weigh the evidence and determine controverted questions of fact. We may dismiss, set aside, or modify the finding, or affirm a lesser finding only if, after weighing all the evidence, we are clearly convinced that the Government did not prove beyond a reasonable doubt that (1) Appellant committed a sexual act upon LH by penetrating LH's vulva with his penis; and (2) Appellant did so without LH's consent. *See MCM*, pt. IV, ¶ 60.b.(2)(d); Article 66(d)(1)(B)(iii), UCMJ (2024 *MCM*).

In assessing the weight of the evidence, we must focus on the issue of LH's credibility, as her testimony was the lynchpin of the Government's case at trial. Understanding we were not present for the witness testimony at trial, we give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." Article 66(d)(1)(B), UCMJ (2024 *MCM*). In this case, we give greater deference to the factfinder regarding witness testimony than we do to other forms of evidence that we can review in the same way as the factfinders did. This factor weighs in favor of finding a factually sufficient conviction.

We find LH's testimony credible. In making this finding, we give substantial weight to certain compelling pieces of evidence that support the veracity of her testimony. Notably, the trial evidence included the text LH sent to Appellant hours before their meet-up on 19 July 2022 in which she told Appellant, "I want to make sure this is not a booty call thing[.]" This statement corroborates her testimony that she did not want to engage in consensual sex with Appellant that night. The evidence also included a text message Appellant sent to LH the next day in which he told her, "Hope you don't hate me too much." This tends to show Appellant's consciousness of guilt.

Further, LH's testimony regarding what happened did not include embellishments or allegations of extreme physical force, use of weapons, or even verbal threats, nor did it include allegations of intoxication or other drugs, details she might have concocted had she been manufacturing her allegation. Additionally, she testified to some non-self-serving details that added to—not detracted from—her credibility, such as taking off her own clothes, laying in the bed while Appellant retrieved a condom rather than trying to leave, and not saying "no" or physically resisting after she removed her clothes.

 Appellant has proffered several reasons to doubt LH's veracity as a witness. These do not firmly or clearly convince us the Government failed to prove its case beyond a reasonable doubt.

Appellant suggests LH had two motives to lie about whether her sexual activity with Appellant on 19 July 2022 was consensual. Specifically, Appellant contends LH fabricated the sexual assault allegation because she felt shame and humiliation from the way Appellant viewed her and their relationship when they had consensual "rough sex." Appellant also suggests LH felt similar shame for her inability to follow her therapist's advice to stop engaging in self-destructive behavior and remain celibate. Appellant also maintains LH lied about the consensual nature of his sexual activity with Appellant to curry favor with her mother, thereby allowing LH to return to her mother's house after her mother had ejected her.

In the court's view, while embarrassment may have led LH to initially be less than forthcoming with investigators regarding the nature of her prior consensual rough sex with Appellant, she ultimately testified to those things at trial, including revealing details that likely caused her additional embarrassment. Moreover, LH's failure to disclose the details of their prior consensual rough sex strongly suggests she understood the difference between consensual sexual activity and sexual assault. In any event, if embarrassment and shame were the motive to lie, as Appellant claims, more embarrassment at trial seems an unlikely course of action.

Regarding LH's relationship with her mother, we note that LH's call to her mother was neither her first (SS) nor second (sister) call after she left Appellant's apartment. We cannot say with certainty that LH did not engage in attention-seeking, favor-seeking, or deceptive behavior toward her mother. However, we are not persuaded that the nature of their relationship motivated LH's initial report and continued persistence through the trial alleging Appellant sexually assaulted her. We similarly do not believe that because LH achieved some measure of reconciliation with her mother following reporting the sexual assault necessarily means she was lying about the details of the assault itself.[16] Moreover, no evidence was introduced that this asserted motive to lie still existed in September 2023 when LH testified at trial.

Appellant also points to examples of instances in which LH acted deceptively outside of court to support the proposition she also deceived the court members on the witness stand. Appellant suggests LH was deceptive toward her mother, to whom she showed marks and bruises, but failed to divulge the context of the consensual, rough-sex-focused relationship with Appellant in which the marks occurred. Appellant also notes LH failed to disclose the nature of her consensual sexual relationship with Appellant (to include infliction of pain, being tied up, and restricted breathing) when talking to SS, the sexual assault nurse examiner, the investigating detectives, or her counsel until two days prior to trial. In the court's view, it is understandable that LH did not want to speak of these things out of embarrassment and concern that her allegations of sexual assault would be taken less seriously. This does not necessarily mean she was lying about the sexual assault, however. Moreover, it suggests LH clearly distinguished between consensual rough sex with Appellant and the sexual assault.

Appellant argues LH's testimony cannot be trusted because some of it contradicted her prior statements about relevant matters. Appellant also contends

---

[16] This reconciliation was apparently short-lived, as LH admitted her mother had again told her she could no longer live at her home by the time LH was interviewed by the police investigators a couple months later.

portions of LH's testimony were internally inconsistent. Appellant further argues the various "memory lapses" indicate LH was unbelievable. Specifically, Appellant notes LH could remember certain details from the night in question, but not others, including whether Appellant bit one or both breasts or what Appellant's response was to her revelation that she had had sex with another man two days after she broke up with Appellant. Appellant contends these memory lapses were "convenient" to avoid embarrassment and humiliation.

That said, although we may be less able to determine the credibility of a witness's testimony regarding certain facts because we were not present for her testimony and able to observe her demeanor, we are more easily able to evaluate internal inconsistencies in a witness's testimony or inconsistencies to which a witness might admit on the record because we have the advantage of a verbatim transcript with which to clearly and concretely compare them.

We find LH's testimony was sufficiently credible that we are not clearly convinced that the finding of guilty was against the weight of the evidence.

### ii) Mistake of Fact

An honest and reasonable mistake that LH consented to Appellant's penetration of her vulva with his penis is an affirmative defense to sexual assault. *McDonald*, 78 M.J. at 379. At Appellant's court-martial, he clearly raised mistake of fact as an affirmative defense. He claimed, through counsel, to have had an honest belief (subjective test) that he had obtained LH's consent to the charged sexual acts and that such a belief was reasonable (objective test). Therefore, the Government had the burden to prove beyond a reasonable doubt that the defense did not exist. More specifically, the Government needed to prove beyond a reasonable doubt that Appellant's mistake was not honest or not reasonable.

This court, in reviewing Appellant's conviction on appeal, must weigh the trial evidence and decide whether we are clearly convinced that the Government failed its burden on *both* prongs. If the Government met its burden on either prong, the mistake of fact defense does not exculpate Appellant.

We find the trial evidence showed that Appellant had an honest, though mistaken, belief that LH consented to sexual intercourse to raise the defense of mistake. While each piece of evidence of Appellant's honest mistake might be insufficient in isolation, when aggregated they suggest Appellant held an honest belief LH consented to his penetrating her vulva with his penis. The following evidence demonstrated Appellant's perspective (listed in order of occurrence surrounding the night in question):

- Appellant told LH "I know you want it" prior to penetrating her.

- LH acknowledged that when Appellant told her to remove her clothes, telling her, "I know you want it," she did so without Appellant's participation. From the time Appellant told LH to remove her clothes, LH never again said "no" or engaged in any physical resistance, including during the entire time he penetrated her.
- While engaging in the charged penetration, Appellant engaged in other sex-related acts that were consistent with how LH had asked him to pleasure her during their prior consensual sexual practice, including inflicting pain and making it difficult for her to breathe.
- After finishing, Appellant laid his head on LH's chest and asked her how she was feeling. During this time, Appellant was "very affectionate" toward LH, which LH admitted was "highly confusing," because from her perspective Appellant had just sexually assaulted her.
- LH testified Appellant could tell LH was not happy after the penetration concluded. In this context, Appellant told her she should not feel bad about failing in her plan to remain celibate because the fact they had sex was "on him."
- After LH left Appellant's home, Appellant texted her, telling her, "[C]ome back I'm horny[.]"

Taken together, these acts and comments suggest Appellant subjectively believed LH consented to sexual intercourse. Our review of the record has revealed little evidence that provides insight into Appellant's mind that suggests Appellant's mistake as to LH's consent was not honest. We conclude the Government did not prove beyond a reasonable doubt that Appellant did not honestly believe LH consented to his penetration of her vulva with his penis.

Turning to the objective prong of the mistake of fact defense, the question here is whether an "ordinary, prudent, sober adult," under all the circumstances known to Appellant at the time, would reasonably believe Appellant had obtained LH's consent to the penetration.

We find LH's words and conduct leading up to and during the charged act, coupled with LH's prior expressed sexual preference and the nature of their prior consensual sexual activity, actually would lead a reasonable person to conclude LH was not consenting to the sexual act of penetration of her vulva.

By itself, a potential sexual partner's removal of their own clothes might suggest consent to sexual activity that follows. In this instance, however, LH's removal of her clothes did not occur in a vacuum. In particular, LH verbally communicated her nonconsent to Appellant in numerous ways. Before she removed her clothes, LH told Appellant: (1) she did not want to have sex with

him (by text before she arrived at his home); (2) she intended to remain celibate (while talking with Appellant on his couch); (3) things would remain "PG" (while kissing on the bed); (4) kissing was "as far as it's going to go." Most importantly, LH told Appellant "no" at least 20 times as he kissed her with increasing urgency and while he was lying on top of her and groping her on his bed.

Furthermore, LH physically communicated her nonconsent. Though she had initially been kissing Appellant back, once he started groping her body with his hands, she stopped kissing him back. Moreover, LH demonstrated her nonconsent to sexual intercourse by attempting to physically resist, placing her hand over Appellant's mouth and her own mouth to prevent continued kissing, then attempting to prevent him from taking off his shirt.

The reasonableness of Appellant's interpretation that he had obtained LH's consent also includes Appellant's knowledge of his own acts. Appellant physically overcame LH's resistance by continuing to kiss and grope her while she said "no" at least 20 to 30 times, moved her hand away from his mouth and hers in order to keep kissing her, removed his shirt when she attempted to prevent him from doing so while she expressed she knew what his removing his shirt meant regarding sexual activity, and kept kissing LH long after she had stopped kissing him back.

"Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). LH's sustained verbal and physical expressions of nonconsent did not convert her ultimate submission, manifested by removing her clothes, into consent. Under these circumstances, in light of numerous verbal and physical indications of nonconsent, a reasonable person would not assume that a person complying with a directive to take off their clothes implicitly constituted consent.

Appellant's contention that LH's enjoyment of rough sex and the nature of their prior sexual acts together rendered his mistake as to LH's consent reasonable is similarly unavailing. Appellant's argument amounts to suggesting that because LH liked consensual rough sex, a reasonable person could mistakenly think her actions during the charged act constituted consent.[17] This

---

[17] Engaging in consensual acts of "rough sex"—even sex like that Appellant and LH had engaged in that involved pretend nonconsensual sex acts, consensual bondage, consensual infliction of pain, and consensual breathing restriction—does not license subsequent nonconsensual sexual activity. However, we acknowledge such consensual behavior might, in some circumstances, increase the possibility that participants in such acts later might misperceive another participant's consent. Stated differently, in

contention ignores how different the circumstances surrounding the charged act were from LH's prior communication and actions surrounding their prior consensual sexual behavior. Specifically, their prior sexual encounters had involved LH communicating what she wanted him to do in an explicit and detailed way, including her asking him to do things like restrict her breathing or inflict greater pain. Simply stated, she regularly told Appellant exactly what she wanted. During the sexual assault, LH engaged in no such communication, instead lying silent. Further, by all indications in the record, during their prior consensual sexual encounters, LH was an active and enthusiastic participant. During the sexual assault, LH lay passively while being penetrated. Moreover, though it is clear that during their brief romantic relationship LH enjoyed engaging in rough sex with Appellant, including being tied up, having her breathing restricted, and having pain inflicted through acts like spanking, there is no evidence in the record that their rough sex had included Appellant overcoming LH's feigned physical resistance, or her pretending to not want sex by repeatedly telling him "no" and physically resisting him when she really wanted sex.[18] In short, LH's behavior before and during the sexual assault were nothing like those of their prior sexual activity. LH's sexual preferences and the nature of their prior activity did not render reasonable Appellant's mistake of fact as to her consent. If anything, LH's behavior before and during the sexual assault was such a departure from prior activity that knowledge of her preferences and prior sexual activity would lead a reasonable person to conclude she was *not* consenting.

For Appellant's factual insufficiency claim regarding the mistake of fact defense to prevail, we must be clearly convinced by the evidence, as we have weighed it, that the Government did not disprove the mistake of fact defense beyond a reasonable doubt. *Harvey*, 85 M.J. at 132. Though the mistake of fact defense was clearly *raised* by the evidence, we are not so convinced.

---

some circumstances, feigned nonconsent may make the line between consent or nonconsent in subsequent situations harder to discern and render misunderstanding regarding consent more likely. The circumstances of this case, however, clearly point in a different direction.

[18] The record is ambiguous regarding the context and meaning of two statements LH apparently made during her brief relationship with Appellant: (1) "I want you to stop, but I really don't want [you] to all at the same time;" and (2) "if you keep doing this, you're going to make me want it." The former statement was made by text, though it is unclear whether that referred to something he was doing at present or fantasizing about something that might occur when they were next together. Regarding the latter statement, neither trial counsel nor trial defense counsel asked LH to elaborate regarding when or how that statement was communicated or what "this" and "it" meant.

### *iii) Factual Sufficiency Conclusion*

We have carefully considered Appellant's claims of factual insufficiency. Because we are not clearly convinced it was against the weight of the evidence, we are powerless to disturb the findings of guilty. Article 66(d)(1)(B), UCMJ (2024 *MCM*).

## B. Admission of LH's Statements to SS as an Excited Utterance

Appellant argues the military judge abused his discretion and committed prejudicial error in allowing SS to testify about her out-of-court phone conversation with LH approximately one hour after the charged sexual assault. Appellant maintains the military judge should have sustained his objection to such testimony as hearsay, *see* Mil. R. Evid. 801–02, rather than allow the Prosecution to offer it pursuant to the hearsay exception for excited utterances, *see* Mil. R. Evid. 803(2). We agree.

### 1. Additional Background

At trial, trial defense counsel timely objected to SS's testimony on the grounds of hearsay. The military judge did not excuse the members or elicit from SS what her testimony would be. Instead, the military judge heard brief arguments by counsel and cited the legal standard for the admission of excited utterance evidence as set forth in *United States v. Arnold*, 25 M.J. 129 (C.M.A. 1987), and *United States v. Donaldson*, 58 M.J. 477 (C.A.A.F. 2003). The military judge stated, in pertinent part:

> While the court does not have the benefit of the subject matter of the statement, the court, based upon the context of previous evidence admitted before this forum, believes that the statements are – occurred approximately an hour after the event.

> They were, as the court understands, about the incident that happened an hour earlier. And, therefore, the court does find that there is a sufficient nexus here and foundation laid to find that this hearsay statement does fall within the exception of an excited utterance; and, therefore, is going to overrule the objection.

In reaching his ruling, the military judge did not articulate any other specific findings of fact regarding: (1) whether the statement was "spontaneous, excited or impulsive rather than the product of reflection and deliberation;" (2) what event prompted the utterance and whether that event was sufficiently "startling" for the purpose of the excited utterance exception; or (3) whether the declarant, LH, was "under the stress of excitement caused by the event." Mil. R. Evid. 803(2); *Arnold*, 25 M.J. at 132 (citations omitted). Similarly, though the military judge listed the "*Donaldson* factors" (see below), and clearly considered the one-hour lapse in time, he did not enter into the record

his findings regarding several of the *Donaldson* factors, including whether the statement was made in response to an inquiry, the age of declarant, the physical and mental condition of the declarant, characteristics of the events, or the subject matter of the statement, the content of which the military judge explicitly acknowledged he was unaware.

After overruling the Defense's hearsay objection, SS testified:

> She called me very upset and said that she had just left [Appellant's] home and that she had sex with him, but she did not want to in the least. She was pushing him off of her and saying no as many times as she could get out. She was very clear about that, and she was very upset over it.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Smith,* 83 M.J. 350, 355 (C.A.A.F. 2023) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *Id.* (quoting *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003)). "[W]here the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted. *Id.* (alteration in original) (quoting *United States v. Finch*, 79 M.J. 389, 397 (C.A.A.F. 2020)).

Mil. R. Evid. 803(2) provides that an "excited utterance," defined as a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is an exception to the general prohibition on hearsay evidence. *See* Mil. R. Evid. 801, 802; *United States v. Bowen*, 76 M.J. 83, 87–88 (C.A.A.F. 2017). "[T]o qualify as an excited utterance: (1) the statement must be 'spontaneous, excited or impulsive rather than the product of reflection and deliberation'; (2) the event prompting the utterance must be 'startling'; and (3) the declarant must be 'under the stress of excitement caused by the event.'" *United States v. Henry*, 81 M.J. 91, 96 (C.A.A.F. 2021) (quoting *Arnold*, 25 M.J. at 132).

"The proponent of the excited utterance has the burden to show by a preponderance of the evidence that each element is met." *Id.* (citations omitted). "The guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *United States v. Chandler*, 39 M.J. 119, 123 (C.M.A. 1994) (citation omitted). "As a general proposition, where a statement relating to a startling event does not immediately follow that event, there is a strong presumption against admissibility under [Mil. R. Evid.] 803(2)." *Donaldson*, 58 M.J. at 484 (citation omitted).

> In determining whether a declarant was under the stress of a startling event at the time of his or her statement, courts have looked to a number of factors. These may include: "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement."

*Id.* at 483 (quoting *Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999)) (additional citation omitted).

"A finding or sentence . . . may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a). Whether an error is harmless is a question of law we review de novo. *Bowen*, 76 M.J. at 87 (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

### 3. Analysis

#### a. Abuse of Discretion

As a preliminary matter, we find that deference to the military judge's evidentiary ruling is not "clearly warranted" because he did not "place[ ] on the record his analysis and application of the law to the facts." *Smith*, 83 M.J. at 355. Although the military judge referenced *Arnold* and *Donaldson*, he neither stated nor applied the three prongs of the "*Arnold* test" on the record. The military judge also did not indicate the burden or standard of proof he was applying.

The essential question remains whether a preponderance of the evidence supported admitting LH's statement to SS as an excited utterance under the three-part "*Arnold* test" as reiterated by our superior court in *Henry*. 81 M.J. at 96. According to this test, we must decide whether the event prompting the utterance was "startling." *Henry*, 81 M.J. at 96 (quoting *Arnold*, 25 M.J. at 132). The Government contends the startling event was LH being sexually assaulted by Appellant approximately one hour before she made the statements to SS. According to the Government, LH "was curled up in a ball while he cal-

lously spoke to her, and . . . once she was over her 'shock' enough to leave Appellant's presence and residence, [LH] was 'crying screaming' as soon as she could speak with another human being."

Neither the parties nor the military judge argued or considered on the record, however, whether LH's delayed realization of what had occurred itself constituted the startling event and we offer no opinion regarding that possibility. We assume without deciding that such an event was startling. However, we find the preponderance of the evidence does not support the other two prongs of the *Arnold* test.

In particular, we find LH's statements to SS were not "spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Arnold*, 25 M.J. at 132. Even if we accept LH's and SS's testimony that LH was emotional and crying when making the statements to SS, we cannot discount that LH had the presence of mind to describe her encounter with Appellant without revealing their history of rough sex. This weighs in favor of us finding LH spoke after due reflection and deliberation rather than spontaneously and impulsively. In fact, according to LH's own testimony, the statements occurred *after* she was "processing what happened." Further, LH testified it was not until LH called SS that she "started putting it together" (what happened) and "realizing how bad it was." LH also acknowledged the "emotionals [sic] didn't all the way kick in" until *after* she left Appellant's apartment and *after* she was "processing." As we have recently noted, one's emotion at the time of making the statement is not dispositive regarding whether the statements are "spontaneous, excited, or impulsive, rather than the product of reflection or deliberation." *See, e.g., United States v. Doroteo*, No. ACM 40363, 2025 CCA LEXIS 49, at *65 n.19 (A.F. Ct. Crim. App. 7 Feb. 2025) (unpub. op.). LH's emotion at the time of her statements to SS did not demonstrate she was "*still* in a state of nervous excitement caused by a startling event," *Chandler*, 39 M.J. at 123 (emphasis added). By her own explanation, she did not become emotional or begin crying until *after* she reflected on ("process[ed]") what had happened.

Second, applying the *Donaldson* factors, we conclude LH's statement to SS was not "under the stress of excitement caused by the event." The military judge's analysis of the admissibility of LH's statement to SS focused entirely on the fact that LH's statement occurred "about an hour" after the precipitating startling event. Although the military judge correctly understood that the amount of time between the event and the utterance is not dispositive, "where a statement relating to a startling event does not immediately follow that event, there is a strong presumption against admissibility under [Mil. R. Evid.] 803(2)." *Donaldson*, 58 M.J. at 484. Accordingly, we apply the criteria our superior court has identified to determine whether a declarant was under the stress of the startling event at the time of the statement.

In this case, "the lapse of time between the startling event and the statement" was significant, not only because it was an hour, but because of what occurred during that hour. According to LH's testimony, after the sexual assault concluded and before she made the statement to SS about what happened, the following occurred: (1) LH put on her clothes and continued to lie in Appellant's bed; (2) Appellant laid his head on her chest and was affectionate toward her while they talked; (3) LH curled up in a ball on Appellant's couch; (4) Appellant noticed LH seemed upset about something and told her she should not feel bad about breaking her intention to remain celibate because it was "all him;" (5) LH revealed to Appellant that she had had sex with another man a week earlier, two days after she and Appellant broke up on 9 July 2022, and Appellant responded to this news in some way; (6) Appellant used his phone to order food that was delivered before LH left Appellant's apartment; (7) after 45 minutes to an hour during which she was sometimes talking with Appellant and sometimes alone, LH left Appellant's apartment; and (8) as LH left Appellant's apartment she was "processing what happened" and the "emotionals [sic] didn't all the way kick in until after [she] left." LH's statements about the startling event did not immediately follow the event, and the circumstances of what occurred during the one-hour lapse of time did not overcome the "strong presumption against admissibility under [Mil. R. Evid.] 803(2)." *Donaldson*, 58 M.J. at 484. To the contrary, what occurred between the startling event and LH's retelling of it to SS weighs significantly against admissibility, especially in light of the underlying premise of excited utterances, which is that "[t]he guarantee of trustworthiness of an excited utterance is that the statement was made while the declarant was still in a state of nervous excitement caused by a startling event." *Chandler*, 39 M.J. at 123 (citation omitted).

Though not clear from the record, it appears at least some of LH's statement to SS that "Appellant had sex with her but she did not want to in the least" was not made in response to an inquiry. However, because of the events detailed above, including the fact LH spent time "processing" what happened prior to making the utterances, we find the fact LH reported the alleged assault to SS rather than responding to an inquiry about it weighs neither in favor of, nor against admissibility, under the excited utterance exception.

As our superior court has observed, in "cases in which the declarant is young, particularly where the statement was made during the child's first opportunity alone with a trusted adult," courts have been more flexible regarding the presumption that statements not made "immediately" after the startling even are inadmissible. *Donaldson*, 58 M.J. at 484 (citations omitted). The cases *Donaldson* cited for this proposition all involved minors, and usually very young children. *See id.* However, here LH was an adult at the time of the inci-

dent and there is no basis to conclude LH's age made her more or less susceptible to an increased or prolonged state of excitement thus making her declaration more or less trustworthy.

Nothing in the record indicates LH was significantly affected by any physical or mental condition at the time of the startling event or declaration that would have made her more or less susceptible to excitement (generally), heightened excitement, or prolonged excitement. LH testified that she had not been using alcohol or drugs during the incident or when making the utterances to SS. On balance, this factor does not weigh in either direction.

Likewise, we find the characteristics of the event do not particularly favor or disfavor the admissibility of the statement. Being sexually assaulted could certainly be startling and lead to excitement, and, according to both LH and SS, LH was emotional when she made the declaration to SS. However, considering the intervening events discussed above between the event and the declaration, the characteristics of the event point in neither direction regarding admissibility.

The subject matter of the statement ultimately elicited from SS was directly related to the startling event alleged. While Appellant contends LH's dishonesty to SS regarding the nature of LH's consensual sexual relationship vitiated the reliability of the declaration at issue here, we find that the close nexus between the statement and its subject weighs in favor of admissibility.

Considered together, we find the *Donaldson* factors weigh against admission of LH's statement to SS. We conclude that the evidence regarding the circumstances of the startling event, the statements, and the intervening events do not support the underlying assumption of the excited utterance exception to the prohibition on hearsay. With two of three elements of the *Arnold* test not met, we find the military judge abused his discretion when he admitted LH's statement to SS as an excited utterance.

### b. Prejudice

"We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Bowen*, 76 M.J. at 89 (quoting *Kerr*, 51 M.J. at 405).

Although legally and factually sufficient, the Government's overall case was not particularly strong, suggesting, under the "every little bit helps" theory, that the erroneously admitted statement was important. Where there is little evidence other than that offered by the complaining witness, "the credibility of the complaining witness is of central importance." *See United States v. Warda*, 84 M.J. 83, 94 (C.A.A.F. 2023) (citation omitted); *see also United*

*States v. Jasper*, 72 M.J. 276, 281 (C.A.A.F. 2013) (concluding where the victim's testimony was critical to the Government's case and the defense theory was that she fabricated at least some allegations against the accused, "the credibility of the putative victim [wa]s of paramount importance"). The Government's case was arguably strongest regarding the elements of its *prima facie* case, especially LH's lack of consent. But LH's testimony was the crux of the Government's case, and her credibility was arguably damaged by multiple lines of inquiry during cross-examination, as detailed in our discussion of factual sufficiency above. Accordingly, the erroneously admitted statement somewhat supported the strongest aspect of the Government's case.

The Government's case was weakest where the Appellant's case was strongest—Appellant's mistake of fact defense. Importantly, LH's statement to SS did not address or substantially affect that defense. Thus, the statement bolstered the part of the Government's case that was strongest even without the statement and did little to counter the strongest aspect of Appellant's case. Accordingly, regarding the relative strength of the Government's and Appellant's cases, we find admission of the statement to have positively, but marginally, impacted the strength of the Government's case and negatively, but marginally, impacted Appellant's case.

Addressing the materiality and quality of the erroneously admitted statement requires further inquiry into the statement's role in the Government's case. The Government offered sufficient evidence to make its *prima facie*, legally sufficient, case without the erroneously admitted statement. Importantly, this is not a case where the excited utterance was the only evidence from an alleged victim who was not testifying at trial. *See, e.g., Doroteo*, unpub. op. at *70–71 (the alleged victim did not testify regarding assault). Admitting LH's statements to SS did not reveal significant information otherwise unavailable to the court-martial because when the statements were offered, LH had already testified about the sexual assault in much greater detail than her declaration to SS subsequently conveyed. SS was the only witness the Government called other than LH.[19]

Although offered and admitted for the truth of the matter asserted (the truth of the sexual assault), the primary value of LH's utterance to the Government's case was in bolstering LH's testimony regarding the sexual assault

[19] The Government's documentary evidence on findings was similarly slim. The text messages between the parties supported both parties' theories of the case and the photographs from the sexual assault nurse's examination were, without more details regarding the extent and nature of the apparently minor injuries depicted, of marginal support to the Government's case. Indeed, the panel acquitted Appellant of the offense related to the biting that was alleged to have caused the injuries supposedly depicted in the photographs.

against challenges to LH's credibility and related defense assertions of motives for LH to lie. The Government called SS as a witness to verify LH's claim that she reported the offense to others and to at least imply that, because LH reported the event not long after the alleged assault, her report must have been true. The statement thus provided some value to the Government's case.

In closing argument, trial counsel commented briefly on LH's statement to SS, referencing the military judge's instructions to consider "the extent to which each witness is either supported or contradicted by other evidence . . . ." Trial counsel told the members:

> You heard testimony from [LH]; but what else supports that testimony? You heard from [SS who] . . . spoke to [LH] after she left [Appellant's] apartment. She testified to how [LH] was over the phone. She was upset. She was crying. [SS] admitted to you that she couldn't recall – [SS] could not recall everything that [LH] said, but, she knew one thing was clear, [LH] went over to the accused's home and he had sex with her and she did not want to. No consent. Evidence that is supported by other evidence.

We recognize that LH's statement to SS may have somewhat boosted LH's credibility in the abstract. But the statement and its timing did little to disprove the Defense's specific theories of LH's motives to lie—that she was lying to her mother about the assault to regain her mother's favor and permission to live at her home or that LH felt shame brought on by Appellant's reaction to her revelation that she had sex with another man. Trial defense counsel successfully brought out the fact that LH did not disclose the full details of her relationship with Appellant to SS, perhaps further diminishing the impact of the statement. Moreover, the statement did nothing to disprove Appellant's mistake of fact defense. Accordingly, we find the erroneously admitted statement to be only marginally material.

Similarly, the quality of the erroneously admitted evidence was marginal. SS acknowledged she did not remember everything LH said in the phone call. SS's recounting of LH's statement to her included a detail—that LH was "pushing [Appellant] off of her" during the alleged sexual assault—that LH disclaimed at trial. Finally, the statement contained little detail regarding the sexual assault itself.

Thus, we find LH's statements to SS did not have a substantial influence on the findings and Appellant was not prejudiced by their erroneous admission.

### III. CONCLUSION

The findings as entered are correct in law and fact. Article 66(d), UCMJ, 10 U.S.C. § 866(d) (2024 *MCM*). In addition, the sentence is correct in law and

fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court